854 A.2d 308

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. KENNETH GUENTHER, DEFENDANT–
RESPONDENT.

Argued December 1, 2003—Decided August 9, 2004.

130

*Steven A. Yomtov,* Deputy Attorney General, argued the cause for appellant (*Peter C. Harvey,* Attorney General of New Jersey, attorney).

*Steven M. Gilson,* Designated Counsel, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, attorney).

Justice ALBIN delivered the opinion of the Court.

Defendant Kenneth Guenther was convicted of sexual assault and other crimes related to the abuse of his stepdaughter. At trial, he was denied the opportunity to present evidence of a prior false accusation of sexual abuse that his stepdaughter made against a neighbor. *N.J.R.E.* 608 embodies the common law rule

that generally forbids admission of specific instances of conduct to attack a witness's character for truthfulness. We must decide, pursuant to *N.J.R.E.* 608, whether the credibility of a witness who has accused a defendant of sexual abuse may be impeached by evidence that she made a prior false criminal accusation. We also must decide whether that issue implicates a defendant's state and federal constitutional right of confrontation.

## I.

### A.

On May 9, 2000, an Ocean County Grand Jury charged defendant Kenneth Guenther in a seven-count indictment with committing various sexual offenses against D.F. when she was between the ages of ten and fourteen. Guenther, the "common-law" husband of D.F.'s mother, lived in the same household as D.F. and acted in the role of her "stepfather" at the time of the alleged acts of sexual abuse. Guenther was charged with first-degree aggravated sexual assault, contrary to *N.J.S.A.* 2C:14–2a (counts one and two); second-degree endangering the welfare of a child, contrary to *N.J.S.A.* 2C:24–4a (count three); second-degree sexual assault, contrary to *N.J.S.A.* 2C:14–2b, c (counts four and five); third-degree aggravated criminal sexual contact, contrary to *N.J.S.A.* 2C:14–3a (count six); and fourth-degree criminal sexual contact, contrary to *N.J.S.A.* 2C:14–3b (count seven).

### B.

On the first day of trial, the prosecutor provided defense counsel with documents detailing that a little more than six months before D.F. accused Guenther of committing various sexual crimes, she admitted to falsely accusing her neighbor of sexually abusing her. The documents consisted of two investigation reports from the Ocean County Prosecutor's Office and two letters addressed to the prosecutor's office, one from Johan E. de Bri-

gard, the Vice Principal of the middle school attended by D.F., and the other from Mary Ellen Cordisco, a counselor at that school.

The letters from the school officials related that D.F. told two of her classmates, D.D. and J.O., that she had been sexually abused by a neighbor named Tony. D.F. informed the two girls that Tony "had exposed himself to her and that he had forced her to have sex with him." D.F. was distraught when she made that claim to her classmates. One day while walking home from school with D.D., D.F. "pointed to the neighbor and said, 'That's the guy I told you about.'" On April 23, 1999, D.D. and J.O. reported what they had learned to Ms. Cordisco, including the man's name and that he was a convicted child molester.

Ms. Cordisco questioned D.F. in the presence of her two classmates concerning her claim of abuse. D.F., at first, "became very defensive, and then hostile and adamantly denied everything." D.F., however, "finally admitted to telling the girls the story about [the neighbor]" and admitted that "she was lying at the time."

Later, D.F. was interviewed by Ms. de Brigard, the Vice Principal, also in the presence of the two girls and Ms. Cordisco. When Ms. de Brigard repeated to D.F. the account she had purportedly given to D.D. and J.O., D.F. "became upset" that her classmates had betrayed her confidence. D.F. admitted telling the "story" to D.D. and J.O. and confessed "that it was a lie." D.F. explained that she had babysat for Tony and his wife and was "angry" at him because she "had heard stories about him" of a "sexual nature." D.F. did not elaborate on those stories, but told Ms. de Brigard that she "was sorry she had made-up the[] charges."

That same day, Ms. de Brigard provided the information gathered during her interview to the Ocean County Prosecutor's Office. On May 3, 1999, D.F. was questioned by an investigator from the prosecutor's office. D.F. denied making the claims to her classmates and denied that her neighbor had abused her. She maintained that J.O. "made up the story to Ms. Cordisco" and that

D.D. went along with it. The investigator's reports did not explain why D.F. admitted to both Ms. Cordisco and Ms. de Brigard that she had made false sexual accusations. The investigation was completed on July 1, 1999, without the filing of any charges against the neighbor.

Based on those facts, defense counsel requested time to interview the people involved in the investigation and permission to cross-examine D.F. about the prior false allegation. Counsel stated his intent to impeach D.F. with extrinsic evidence in the event she denied making the false accusation. The court rejected defendant's request for a hearing and ruled that the purported false accusation was "irrelevant" and "extremely collateral" and, therefore, inappropriate for consideration by the jury.

A trial before a jury proceeded on March 20–22, 2001. The trial testimony presented two conflicting versions of events.

## C.

In January 2000, then fourteen-year-old D.F. accused her "stepfather," defendant Kenneth Guenther, of sexual abuse. D.F.'s mother, Lorraine, and Guenther had lived together as "common law" husband and wife for more than ten years before marrying in the fall of 2000. D.F. had lived with her mother and Guenther since she was four years old when her mother divorced her biological father. D.F. testified that she and her older brother, P.F., considered Guenther their "stepfather" because he had acted in the role of their father since they were children.

According to D.F., Guenther began abusing her when she was nine years old. At first, Guenther exposed himself to D.F. in the bathroom and forced her to "masturbate" him. That abuse occurred monthly when the two were home alone while her mother was at work. D.F. remained silent about the abuse because Guenther told her that if she complained her mother would get in trouble.

On direct examination, D.F. testified that when she was around twelve years old, Guenther started forcing her to perform oral sex on him. Initially, that abuse occurred once a week and then progressed to every other day. On cross-examination she admitted telling the grand jury that the abuse occurred three to four times a day. D.F. stated that when she was around thirteen years old, Guenther started performing oral sex on her. D.F. began to consider sexual acts with Guenther as "just like one of [her] chores." As she got older, D.F. kept the abuse a secret because she feared that she would "pay for" her disclosure by being "hit" or "smacked" by Guenther.

Sometime in 1998 or 1999, D.F. told her brother, P.F., that Guenther was sexually abusing her, although she did not provide many details. On Thanksgiving Day 1999, D.F., her mother, and P.F. visited a relative's house without Guenther. On the drive home, P.F. told his mother that Guenther was molesting D.F. Upon arriving home, Lorraine spoke with Guenther, and for the next week kept a close eye on her daughter. According to D.F., after a week, "it just went back to normal" and the abuse continued. D.F. was resigned that if her mother did not believe her, no one would.

D.F. viewed Guenther as a strict parent, but also recognized that he "favored" her over her brother. On the one hand, Guenther and Lorraine kept a tight rein on their daughter. D.F. had to stay at home to complete her chores, could only visit a friend who lived one house away, and was not allowed to venture further than the end of her street. On the other hand, Guenther, a bail enforcement agent, took D.F. everywhere with him, including on his "bounty hunter" assignments, during which they were together sometimes until the early morning hours.

In 1999, D.F. "skipped" school one day with one of her brother's friends, John Cowie, who was several years older than D.F. Guenther and Lorraine strongly disapproved of their daughter's relationship with Cowie. Guenther accused D.F. of smoking marijuana with Cowie. At first D.F. denied the accusation, but

confessed after Guenther struck her and her brother with a cutting board. After Guenther went to visit Cowie's parents, D.F. professed to be neither concerned nor embarrassed.

In January 2000, D.F.'s brother ran away and made his way to the home of their natural father. After P.F. arrived at his father's house, the police were called to arrange for his transport home. During that process, P.F. spoke with the police and revealed that his sister had been molested by Guenther. That same day, a Division of Youth and Family Services (DYFS) worker was dispatched to interview D.F. at her home.

In the interview, D.F. denied she had been abused by Guenther. At trial, D.F. said that she lied to the DYFS worker because Guenther was within hearing distance during the interview, and she feared that if she disclosed the truth she would later be beaten. D .F. also believed that no one would believe her because Guenther had friends on the local police force and was involved with the court system.

The next day, in response to a court order, D.F. appeared in the Ocean County Courthouse because her natural father had taken legal steps to gain custody of both her and her brother. While in the courthouse complex, D.F. was interviewed by members of the prosecutor's office and revealed the history of Guenther's sexual abuse of her. Since that day, D.F. and P.F. have lived with their natural father and stepmother.

P.F., who was seventeen at the time of trial, testified that on four to six separate occasions in 1998 and 1999, D.F. and Guenther appeared "surprised" and even "shocked" when he returned home while they were alone in the master bedroom. However, when he gave his statement to the prosecutor, P.F. could recall only one or two such occasions. Those were the only times that P.F. witnessed anything suspicious between his sister and Guenther, although he felt that they were closer "than father and daughter should be."

Sometime in 1998 or 1999, his sister told him that Guenther had touched her improperly. According to P.F., he told his mother about D.F.'s allegations on at least two occasions over the course of the next year and a half, but his mother suggested that she would take the allegations seriously only if they came from D.F. Nevertheless, his mother instructed him to make sure that D.F. and Guenther were not left alone together in the house.

In January 2000, P.F. ran away because "there was too much stuff" going on at home and his "mom was not doing anything" about it. At about that time, P.F.'s mother told him that unless his grades improved he would not be allowed to get his driver's license until he turned eighteen. After P.F.'s revelations about the abuse of his sister, he moved in with his natural father, did not return to school, and obtained his license—at age seventeen.

D.F.'s mother, Lorraine, testified for the defense and described Guenther as a "wonderful" father. She stated that she and Guenther disapproved of their thirteen-year-old daughter's interest in seventeen-year-old John Cowie. After D.F. admitted to "skipping" school and smoking marijuana with Cowie, they "grounded" her, restricting her to their property and barring her use of the telephone. In addition, she and Guenther went to Cowie's house to speak with his parents. As a result, D.F. became "very, very angry," went into a "temper tantrum," started "slamming things," and told them that it was "none of [their] business."

Lorraine also explained that when P.F., then sixteen years old, dropped out of school, she gave him an ultimatum that he either return to school or find a job—otherwise he would not be permitted to get a driver's license. P.F., instead, ran away from home. Lorraine denied that her children ever informed her that Guenther had abused D.F., and claimed that she first learned of the allegations when the DYFS worker came to her house in January 2000. Although she had never spoken with D.F. about the abuse allegations, she did not believe her daughter.

In his testimony, Guenther denied the charges and described himself as a caring and fair parent. He stated that he had been a father to D.F. since she was a young child and that he loved D.F. and P.F. with "all [his] heart" and would never harm them in any way. He also denied that D.F. was restricted to the house or that she frequently accompanied him alone on errands and work-related trips.

Before summations, the trial court dismissed counts six (third-degree aggravated criminal sexual contact) and seven (fourth-degree criminal sexual contact) because they were duplicative of the remaining counts in the indictment. The jury found Guenther guilty of counts one through five. The court sentenced Guenther to concurrent eighteen-year terms of imprisonment on his two convictions of first-degree aggravated sexual assault (counts one and two) and to a consecutive seven-year term of imprisonment on his conviction of second-degree endangering the welfare of a child (count three). In all, Guenther received an aggregate twenty-five year state prison term. The court merged the second-degree sexual assault convictions (counts four and five) into counts one and two.

On appeal, the Appellate Division in a *per curiam* opinion remanded for a *N.J.R.E.* 104 hearing to determine whether D.F. made an allegation that her neighbor had sexually abused her, and if so, whether the allegation was false. The panel directed that if the trial court were to find that D.F. made a false accusation, evidence relating to the accusation would still be subject to the *Rules of Evidence.* The panel concluded that if the court on remand determined that D.F. did not falsely accuse her neighbor or if it determined that she did and that the evidence nevertheless was inadmissible, then the verdict would stand. If, however, the court found that D.F. did make the false accusation and that it was admissible, a new trial would be necessary.

The State petitioned for certification arguing that the Appellate Division's decision and an earlier opinion, *State v. Bray,* 356 *N.J.Super.* 485, 813 *A.2d* 571 (App.Div.2003), were contrary to

New Jersey evidence law that prohibits evidence of specific instances of conduct, not the subject of a prior conviction, to impeach a witness's character for truthfulness. We granted certification. 177 *N.J.* 489, 828 *A.*2d 917 (2003).

## II.

### A.

We must decide whether the Appellate Division correctly ruled that an alleged victim of a sexual assault may be impeached by evidence that, on a previous occasion, she falsely accused a person of sexually abusing her. Relying on *State v. Bray,* 356 *N.J.Super.* 485, 496, 813 *A.*2d 571 (App.Div.2003), the appellate panel ordered a remand to the trial court to determine whether the alleged victim falsely accused her neighbor of committing a sexual offense and, if so, whether such evidence is admissible. The State contends that our evidentiary rules forbid the introduction of specific conduct evidence relating to character to undermine the credibility of a victim-witness. The State asks this Court to reverse the panel's holding and to repudiate *Bray.*

Defendant asks us to make an exception to the general prohibition on the use of specific conduct evidence to allow him to establish D.F.'s character for lack of truthfulness. Defendant argues for the admission of D.F.'s prior false criminal accusation for the purpose of drawing the inference that a witness who has falsely accused once will do so again. Defendant claims that even if our evidentiary rules prohibit the use of a prior false accusation to undermine the credibility of his accuser, his federal and state constitutional right to confrontation would override those rules and compel the admission of the evidence.

### B.

New Jersey's *Rules of Evidence* generally prohibit evidence of "a person's character or a trait of his character" offered to prove that the person acted in conformity with that trait on a particular

occasion. *N.J.R.E.* 404(a). The general prohibition on the use of character evidence, however, is subject to a number of exceptions. See *N.J.R.E.* 404(a)(1) to (3). We address one such exception in this case, the use of evidence of a witness's character for untruthfulness to attack that witness's credibility at trial. *N.J.R.E.* 404(a)(3), 608.

*N.J.R.E.* 608 provides that

> [t]he credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, provided, however, that the evidence relates only to the witness' character for truthfulness or untruthfulness, and provided further that evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise. Except as otherwise provided by Rule 609 [prior conviction], a trait of character cannot be proved by specific instances of conduct.

Thus, our rules permit evidence in the form of opinion, reputation, or a prior criminal conviction to attack a witness's credibility by establishing the witness's character for untruthfulness. *N.J.R.E.* 608, 609. A party may introduce such evidence for the purpose of asking a jury to draw an inference that a witness with a reputation for untruthfulness is capable of lying on the stand. However, evidence of specific instances of conduct—other than a prior conviction—to prove the character trait of untruthfulness is prohibited. *N.J.R.E.* 608. For example, we do not allow a party to attack a witness's general credibility through the introduction of specific evidence that the witness falsely completed a licensing application. *See, e.g., State v. De Paola*, 5 *N.J.* 1, 9–10, 13, 73 *A.*2d 564 (1950) (finding reversible error to permit cross-examination testimony of defendant about false answers he provided in application for liquor license for purpose of showing defendant was unworthy of belief).

*N.J.R.E.* 404(a)(2) provides for the broader use of character evidence against a victim by allowing the introduction of "[e]vidence of a pertinent trait of character of the victim of the crime." The character trait of untruthfulness is but one of a number of traits that might apply to a victim-witness. We note that veracity is a pertinent character trait whenever a victim gives testimony. The proof requirements when using character evidence against a

victim are the same as under *N.J.R.E.* 608. Proof of that charac-
ter trait must be by "evidence of reputation, evidence in the form
of opinion, or evidence of conviction of a crime which tends to
prove the trait," and not by "[s]pecific instances of conduct not the
subject of a conviction." *N.J.R.E.* 405(a). Specific instances of
conduct are admissible, however, when a character trait is an
"essential element of a charge, claim, or defense," as in a defama-
tion case. *N.J.R.E.* 405(b), 404(c). In this case, character is not
directly at issue, and, therefore, the general prohibition on specific
conduct evidence applies.

## C.

The general principle embodied in *N.J.R.E.* 608 and 405(a)
originated in the common law. Accordingly, we must examine the
rationale for the common law rule barring the use of specific
conduct evidence to challenge a witness's credibility for truthful-
ness. We must determine whether that rule has continuing
vitality when applied to evidence of a victim-witness's prior false
accusation.

Several centuries ago, courts began to prohibit the use of prior
instances of conduct to attack the credibility of a witness for two
essential reasons: to prevent unfairness to the witness and to
avoid confusion of the issues before the jury. 3A *Wigmore on
Evidence* § 979, at 823, 827 (Chadbourn rev.1970). Those reasons
remain the present justification for the exclusion of specific con-
duct evidence. *Id.* at 823, 73 *A.*2d 564. The use of prior instances
of misconduct to impeach credibility was considered to be unfair to
the witness because "it would be practically impossible for the
witness to have ready at the trial competent persons who would
demonstrate the falsity of allegations that might range over the
whole scope of his life." *Id.* at 826, 73 *A.*2d 564. Thus, the rule
was designed to prevent unfair foraging into the witness's past, as
well as unfair surprise.

The second rationale for the bar on specific conduct evidence
was the concern that such wide-ranging collateral attacks on the

general credibility of a witness would cause confusion of the true issues in the case. *Ibid.* Courts were reluctant to permit testimony on minor points that would invite more tangential testimony relating to the witness's character for truthfulness, needlessly protracting the trial "with relatively little profit." *Ibid.* Modern courts continue to cite that rationale—the avoidance of "minitrials" on collateral matters that "tend to distract and confuse the jury"— as the primary justification for the exclusion of prior acts evidence. *Carter v. Hewitt,* 617 *F.*2d 961, 971 (3rd Cir.1980). It was not a lack of relevance that gave rise to the rule prohibiting evidence of prior instances of untruthful conduct to impeach the witness's credibility, but the "auxiliary policies" regarding unfairness to the witness, confusion of issues, and undue consumption of time. *Wigmore, supra,* § 979, at 827.

When those "auxiliary policies" do not apply, the rationale for the exclusion of such evidence no longer exists. *Ibid.* An example is the long-standing rule allowing the admission of a prior criminal conviction as a method of undermining the general credibility of a witness. *Id.* § 980, at 828. The use of a prior criminal conviction does not require the calling of witnesses because "the judgment cannot be reopened and no new issues" are raised. *Ibid.* In addition, there is no danger of unfair surprise because the witness presumably is aware of his own record of conviction. *Ibid.* Similarly, our rules permit testimony in the form of an opinion regarding a witness's reputation for lack of truthfulness in the community because the scope of inquiry is limited and the witness is protected against a prolonged excursion on a collateral matter. *See State v. Polhamus,* 65 *N.J.L.* 387, 388, 47 *A.* 470 (1900) (stating that law supposes that impeached witness is "capable of supporting his reputation for truthfulness whenever it is attacked"). In short, our rules recognize the power and relevance of evidence relating to a witness's character for truthfulness. However, we prohibit the use of specific instances of conduct to prove a character trait for pragmatic reasons associated with the efficient and orderly presentation of a trial.

## D.

Long before New Jersey codified its *Rules of Evidence,* our courts recognized the common law rule that "proof of particular independent facts, though bearing upon the question of veracity" may not be employed for the purpose of discrediting the character of a witness. *State v. Hendrick,* 70 *N.J.L.* 41, 45, 56 *A.* 247 (1903). Although earlier cases decided under the codified *Rules of Evidence* followed the common law and disallowed evidence of a prior false charge to impeach the credibility of the accuser, more recent cases have parted from that strict formula.[1]

In *State v. Mondrosch,* 108 *N.J.Super.* 1, 2–5, 259 *A.*2d 725 (App.Div.1969), *certif. denied,* 55 *N.J.* 600, 264 *A.*2d 71 (1970), a burglary case, the Appellate Division interpreted former *Evidence Rules* 22 and 47, predecessors to *N.J.R.E.* 608, consistent with the common law tradition. The court ruled that the defendant could not impeach the prosecution's primary witness, a police officer, by eliciting evidence that the officer "had previously falsely accused certain persons of committing criminal acts." *Id.* at 4, 259 *A.*2d 725. The court concluded that the "evidence of specific instances of [the officer's] past misconduct" proffered to impugn his credibility was inadmissible because such evidence was "explicitly limited" by former *Evidence Rules* 22 and 47. *Id.* at 4, 5, 259 A.2d 725.

In *State v. Hummel,* 132 *N.J.Super.* 412, 418, 334 *A.*2d 52 (App.Div.), *certif. denied,* 67 *N.J.* 102, 335 *A.*2d 54 (1975), the defendant-foster father was charged with sexually abusing two minor children in his care. The defendant attempted to impeach the credibility of his two young female wards by presenting evidence that they had previously fabricated "a serious matter"

---

[1] *N.J.R.E.* 608's general bar on the use of specific conduct evidence to prove or disprove a trait of character, such as truthfulness, remains, in substance, unchanged from its earlier version, former *Evidence Rule* 22, which states "evidence of specific instances of his conduct, relevant only as tending to prove a trait of his character, shall be inadmissible." *See State v. Hummel,* 132 *N.J.Super.* 412, 427, 334 *A.*2d 52 (App.Div.), *certif. denied,* 67 *N.J.* 102, 335 *A.*2d 54 (1975).

and that one had made an accusation against her uncle similar to the one made against the defendant. *Id.* at 427, 334 *A.*2d 52. Construing former *Evidence Rule* 22, the Appellate Division upheld the trial court's exclusion of that impeachment evidence, reasoning that the "defendant's approach was improper both in the character traits it sought to establish and in the use of specific instances of conduct to establish these traits." *Ibid.* The court found that the evidence of prior accusations did not "show bias against this defendant or a motive to fabricate." *Id.* at 428, 334 *A.*2d 52. Instead, the court found that the evidence was offered to show an "instability of character" on the part of both girls, and that one possessed an "accusatory trait." *Id.* at 427, 334 *A.*2d 52. The court concluded that the evidence was inadmissible under our evidence rules and its exclusion did not violate the defendant's confrontation rights. *Id.* at 427–28, 334 *A.*2d 52.

A different approach was taken in evaluating the use of a prior false accusation under the current version of the *Rules of Evidence* in *State v. Ross*, 249 *N.J.Super.* 246, 592 *A.*2d 291 (App.Div. 1991). In that case, the defendant was convicted of criminal charges related to the sexual abuse of a ten-year-old child based on the child's uncorroborated testimony. *Id.* at 247, 592 *A.*2d 291. In reversing, the Appellate Division concluded that the prosecutor acted improperly by suggesting in summation that the alleged victim's youth and inexperience precluded her from fabricating the allegations when the prosecutor knew that the child had claimed to have been abused twice before. *Id.* at 248–50, 592 *A.*2d 291. The court ordered that on remand a hearing should be held to address the admissibility of the evidence relating to the prior accusations. *Id.* at 252, 592 *A.*2d 291. In directing that the defendant should be "accorded a full opportunity to explore the issue of the truth or falsity of the victim's allegations of prior abuse," the court noted:

> If there were a judicial determination that these allegations were probably false, the incidents could no longer be characterized as sexual conduct, proof of which is barred by the Rape Shield Law. *Rather, proof of the probably false allegations themselves would be admissible to impeach the victim's credibility. See, e.g., State v. Barber,* 13 *Kan.App.*2d 224, 766 *P.*2d 1288 (1989). If on the other hand, the allegations were deemed to be probably true, they might be held to be admissible

either, as in [*State v. Budis*, 125 *N.J.* 519, 593 *A.*2d 784 (1991)], to offer an alternative source of sexual knowledge, or, depending on the circumstances surrounding the reporting of these incidents by the victim to her mother, to offer a motive for the child to have made a false accusation.

[*Ibid.* (emphasis added).]

The Appellate Division in *Ross* did not analyze how "probably false allegations" could be admitted to impeach the credibility of the accuser-witness consistent with the language of *N.J.R.E.* 608. The court did, however, intimate by its reference to a Kansas case, *State v. Barber,* that barring such evidence would violate the defendant's right of confrontation. In *Barber, supra,* the Kansas Court of Appeals stated that its evidentiary rule (similar to our *N.J.R.E.* 608), prohibiting evidence of a witness's specific conduct to prove a trait of character, "must bend," under certain circumstances, to the defendant's constitutional right of confrontation. 766 *P.*2d at 1290. Finding that the defendant's confrontation rights trumped the evidentiary rule barring specific conduct evidence, the Kansas Court of Appeals concluded that "in a sex crime case, the victim/complaining witness may be cross-examined about prior false accusations, and if she denies making those accusations, defendant may put on evidence of those accusations." *Ibid.* The Kansas court, however, conditioned admissibility of the evidence on a judicial finding of a "reasonable probability" that the accusation is false. *Ibid.*

In *State v. Bray, supra,* the Appellate Division reaffirmed the holding in *Ross* and allowed the admission of evidence of a prior false criminal allegation, provided that the evidence met "applicable evidentiary requirements." 356 *N.J.Super.* at 496, 813 *A.*2d 571. In *Bray,* the defendant was convicted of various crimes related to his sexual assault of K.P. when she was less than thirteen years old. *Id.* at 488–89, 813 *A.*2d 571. In the process of responding to police questioning concerning her allegations against the defendant, K.P., then nearly fourteen years old, stated that she had been sexually abused at the age of three or four by a person named Detrick. *Id.* at 488, 813 *A.*2d 571. At his trial, the defendant was precluded from examining K.P. about the sexual

abuse allegation against Detrick—who had denied the allegation—
or to call witnesses to prove its falsity for the purpose of attacking
K.P.'s credibility. *Id.* at 488–89, 813 *A*.2d 571.

In reviewing the defendant's petition for post-conviction relief,
the Appellate Division reasoned that the Rape Shield Law, which
generally prohibits the disclosure of a victim's prior sexual con-
duct, did not apply because false allegations do not constitute
previous sexual conduct as defined in *N.J.S.A.* 2C:14–7f. *Id.* at
494–95, 813 *A*.2d 571. The appellate panel found that the trial
court, at a minimum, should have taken testimony from K.P.,
K.P.'s mother, and Detrick, and ordered a remand for the trial
court to conduct an evidentiary hearing to determine whether
K.P.'s allegations "were probably false." *Id.* at 495–97, 813 *A*.2d
571. The admission of the prior false accusation was made subject
to the requirements of various evidence rules, including *N.J.R.E.*
401, 403, and 608. *Id.* at 496, 813 *A*.2d 571. The panel did not
decide whether a prior false allegation introduced to establish a
victim-witness's character for lack of truthfulness passed muster
under those evidence rules. Instead, the trial court was instruct-
ed to consider a non-exclusive set of factors in deciding the
admissibility of the evidence:

> [the] defendants right of confrontation; whether the evidence was relevant to the
> defense; whether its probative value outweighs its prejudicial effect; whether or
> not the prior allegations closely resemble the acts alleged in the indictment; the
> difference in the age and maturity of the child at the time of the prior allegations
> as compared with the age and maturity of the child at the time of the incidents
> complained in the indictment; and whether such evidence would create confusion of
> the issues or unwarranted invasion of the privacy of the victim.
>
> [*Id.* at 497, 813 *A*.2d 571 (internal citations omitted).]

In the present case, the appellate panel, quoting *Bray,* remand-
ed for a hearing to determine whether D.F.'s prior allegations are
probably false and, if so, whether the evidence in support of those
allegations is admissible under *N.J.R.E.* 401, 403, 607, and 608.
The panel directed the trial court on remand to consider the same
factors enunciated in *Bray.*

■ The appellate panels in *Ross, Bray,* and this case never analyzed whether a prior false accusation was admissible under *N.J .R.E.* 608. That rule simply states that a "trait of character cannot be proved by specific instances of conduct." *N.J.R.E.* 608. We conclude that a prior false allegation is not admissible to impeach the general credibility of a witness under a plain reading of *N.J.R.E.* 608. The next issue is whether an exception to *N.J.R.E.* 608 is warranted under limited circumstances and, if not, whether the Federal and State Confrontation Clauses compel the admission of that evidence.

### E.

■ The Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution guarantee a criminal defendant the right to confront "the witnesses against him" and "to have compulsory process for obtaining witnesses in his favor." *U.S. Const.* amend. VI; *N.J. Const.* art. I, ¶ 10. We have observed that both rights are essential to a " 'fair opportunity to defend against the State's accusations,' " and are, therefore, essential for a fair trial. *State v. Garron,* 177 *N.J.* 147, 169, 827 *A.*2d 243 (2003) (quoting *Chambers v. Mississippi,* 410 *U.S.* 284, 294, 93 *S.Ct.* 1038, 1045, 35 *L.Ed.*2d 297, 308 (1973)), *cert. denied,* 540 *U.S.* 1160, 124 *S.Ct.* 1169, 157 *L.Ed.*2d 1204 (2004). A defendant's right to confrontation is exercised through cross-examination, which is recognized as the most effective means of testing the State's evidence and ensuring its reliability. *Lilly v. Virginia,* 527 *U.S.* 116, 124, 119 *S.Ct.* 1887, 1894, 144 *L. Ed.*2d 117, 126 (1999); *California v. Green,* 399 *U.S.* 149, 158, 90 *S.Ct.* 1930, 1935, 26 *L.Ed.*2d 489, 497 (1970) (stating that cross-examination is " 'greatest legal engine ever invented for the discovery of truth' ") (quoting 5 *Wigmore* § 1367); *Pointer v. Texas,* 380 *U.S.* 400, 404, 85 *S.Ct.* 1065, 1068, 13 *L. Ed.*2d 923, 926 (1965).

■ The right to confrontation and compulsory process are intended to accommodate "legitimate interests in the criminal trial process, such as established rules of evidence and procedure

designed to ensure the fairness and reliability of criminal trials."
*Garron, supra,* 177 *N.J.* at 169, 827 *A.*2d 243 (quoting *Chambers, supra,* 410 *U.S.* at 295, 302, 93 *S.Ct.* at 1046, 1049, 35 *L.Ed.*2d at 309, 313); *see also State v. Budis, supra,* 125 *N.J.* at 531–32, 593 *A.*2d 784. Those rights, however, do not bow to "the mechanistic application of a state's rules of evidence or procedure [that] would undermine the truth-finding function by excluding relevant evidence necessary to a defendant's ability to defend against charged offenses." *Garron, supra,* 177 *N.J.* at 169, 827 *A.*2d 243 (citing *Chambers, supra,* 410 *U.S.* at 302, 93 *S.Ct.* at 1049, 35 *L.Ed.*2d at 313; *Budis, supra,* 125 *N.J.* at 532, 593 *A.*2d 784).

The United States Supreme Court decision in *Davis v. Alaska,* 415 *U.S.* 308, 94 *S.Ct.* 1105, 39 *L.Ed.*2d 347 (1974), provides the paradigm by which to examine the tension between a states evidentiary rule and a defendants confrontation rights. *Davis* held that the Sixth Amendment right to confrontation trumped a state statute and procedural rule protecting the privacy of a juvenile's delinquency record. *Id.* at 319, 94 *S.Ct.* at 1111–12, 39 *L.Ed.*2d at 355. While serving a probationary term for a juvenile delinquency adjudication, the State's key witness in *Davis* cooperated with the prosecution and gave testimony implicating the defendant in a burglary. *Id.* at 310–11, 94 *S.Ct.* at 1107, 39 *L.Ed.*2d at 350. The defendant sought to show that the juvenile witness, due to his vulnerable probationary status, had an incentive to cooperate and curry favor with the State. *Id.* at 311, 94 *S.Ct.* at 1108, 39 *L.Ed.*2d at 351. The defendant intended to impeach the juveniles credibility by revealing his bias toward the prosecution. *Ibid.* Because Alaska's statutory and procedural provisions placed a cloak of confidentiality over the juveniles records, the trial court barred any cross-examination on the juveniles adjudication or his probationary status. *Ibid.* The Supreme Court recognized the privacy interests at stake, but concluded that "[t]he State's policy interest in protecting the confidentiality of a juvenile offender's record cannot require yielding of so vital a constitutional right as the effective cross-examination for

bias of an adverse witness." *Id.* at 320, 94 *S.Ct.* at 1112, 39 *L.Ed.*2d at 356.

In reversing the defendants conviction in *Davis*, the Supreme Court distinguished between a general attack on credibility and a more particular attack on credibility. *Id.* at 316, 94 *S.Ct.* at 1110, 39 *L.Ed.*2d at 353–54. As the Court noted, the use of a prior conviction for the purpose of having a jury "infer that the witness character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony" is a general attack on credibility. *Ibid.* The examination of a witness "directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case" is a particular attack on credibility. *Ibid.* The Court suggested that a particular attack on credibility is entitled to special protection under the Confrontation Clause. *Id.* at 316–17, 94 *S.Ct.* at 1110–11, 39 *L.Ed.*2d at 353–54. The Court "recognized that the exposure of a witness motivation [such as bias] in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Ibid.* On the other hand, there was no suggestion in *Davis* that the use of the prior juvenile record to impeach the witness's character for truthfulness—a general attack on credibility—in violation of Alaska's rules would have been compelled under the Confrontation Clause. Justice Stewart, in his concurring opinion, drove home the point by stating, "I would emphasize that the Court neither holds nor suggests that the Constitution confers a right in every case to impeach the general credibility of a witness through cross-examination about his past delinquency adjudications or criminal convictions." *Davis, supra,* 415 *U.S.* at 321, 94 *S.Ct.* at 1112–13, 39 *L.Ed.*2d at 356 (Stewart, J., concurring).

Since *Davis*, the United States Supreme Court has not decided a case in which the Confrontation Clause has overridden a states rule barring evidence introduced for the sole purpose of attacking general credibility. *Quinn v. Haynes,* 234 *F.*3d 837, 846 (4th Cir.2000), *cert. denied,* 532 *U.S.* 1024, 121 *S.Ct.* 1968, 149 *L.Ed.*2d 762 (2001). The Supreme Court has shown considerable deference to evidence rules that are deeply rooted in the common law and that promote the efficient and orderly presentation of reliable

evidence. *See, e.g., White v. Illinois,* 502 *U.S.* 346, 356, 112 *S.Ct.* 736, 743, 116 *L.Ed.*2d 848, 859 (1992) (stating that Confrontation Clause is not violated when hearsay is of sufficient reliability to come within firmly rooted exception to hearsay rule); *Idaho v. Wright,* 497 *U.S.* 805, 816–17, 110 *S.Ct.* 3139, 3147, 111 *L.Ed.*2d 638, 653 (1990) (same).

In this case, defendant argues that the Confrontation Clause takes precedence over the common law rule embodied in *N.J.R.E.* 608 to the extent that that rule bars impeachment of a witness with a prior false criminal accusation. In *Davis, supra,* the Confrontation Clause was the means for upholding the longstanding common law rule that bias is never collateral. 415 *U.S.* at 316–17, 94 *S.Ct.* at 1110, 39 *L.Ed.*2d at 354; *see also Greene v. McElroy,* 360 *U.S.* 474, 496, 79 *S.Ct.* 1400, 1413, 3 *L.Ed.*2d 1377, 1390–91 (1959) (noting that ability of accused to challenge witness's motivation by showing "malice, vindictiveness, intolerance, prejudice, or jealousy" has "ancient roots" that have "remained relatively immutable in our jurisprudence"). Here, unlike *Davis,* defendant contends that the common law rule embodied in *N.J.R.E.* 608 must give way to the superior claim of the Confrontation Clause. Undoubtedly, the Confrontation Clause was not intended to sweep aside all evidence rules regulating the manner in which a witness is impeached with regard to general credibility. *See Davis, supra,* 415 *U.S.* at 321, 94 *S.Ct.* at 1112, 39 *L.Ed.*2d at 356 (Stewart, J., concurring). Today, we conclude that creating a limited exception to *N.J.R.E.* 608 to allow a prior false accusation to be used to impeach a victim-witness's credibility will promote fairness in the trial process and is not inconsistent with the rationale underpinning the rule. Because we decide the issue on state grounds, we need not address the constitutional question arising under the Federal Confrontation Clause. *See In Re New Jersey Am. Water Co.,* 169 *N.J.* 181, 197, 777 *A.*2d 46 (2001) (stating that "courts should not reach constitutional questions

unless necessary to the disposition of the litigation") (citation omitted).

## F.

As noted, *N.J.R.E.* 608 follows the common law rule and does not allow the use of specific instances of conduct, such as a prior false accusation, to impeach a witness's character for truthfulness. Various courts across the nation have addressed the issue whether a defendant may impeach the credibility of a witness-accuser by showing that the witness made a prior false criminal accusation. Notwithstanding the common law bar, in sexual crime cases many courts have permitted cross-examination of a witness-accuser who has falsely alleged a sexual crime on a previous occasion. A number of courts also permit the introduction of extrinsic evidence to prove the point. Some courts have carved out an exception to their rules of evidence; others have found justification in the Federal Confrontation Clause or in their own states Confrontation Clause.

Unlike New Jersey, many states have codified a rule similar to *Fed.R.Evid.* 608(b), which provides:

Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. *They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.*
[(Emphasis added.)]

Under that rule, with the permission of the court, a defendant is allowed to cross-examine his accuser about a prior false criminal accusation that is probative of the witness's character for truthfulness. *Ibid.* The caveat is that under the federal rule the defendant is bound by the witness's response and may not introduce extrinsic evidence to disprove the witness's denial. *Ibid.*

Maine, Maryland, Missouri, New Mexico, Ohio, Tennessee, Vermont, and Wisconsin follow the federal rule and allow cross-examination concerning a prior false accusation that is probative of the witness's character for truthfulness, but do not allow the

use of extrinsic evidence to contradict the witness's answer or to prove the character trait. *See, e.g., State v. Almurshidy,* 732 *A.*2d 280, 287 n. 4 (Me.1999); *State v. Cox,* 298 *Md.* 173, 468 *A.*2d 319, 323–24 (1983); *State v. Raines,* 118 *S.W.*3d 205, 211–14 (Mo.Ct. App.2003); *State v. Scott,* 113 *N.M.* 525, 828 *P.*2d 958, 962–63 (Ct.App.1984); *State v. Boggs,* 63 *Ohio St.*3d 418, 588 *N.E.*2d 813, 816–17 (1992); *State v. Wyrick,* 62 *S.W.*3d 751, 780–82 (Tenn.Crim. App.2001); *State v. Leggett,* 164 *Vt.* 599, 664 *A.*2d 271, 272 (1995); *State v. Olson,* 179 *Wis.*2d 715, 508 *N.W.*2d 616, 619–20 (Ct.App. 1993), *reh'g denied,* 515 *N.W.*2d 715 (Wis.1994).

Alaska, Arizona, Arkansas, Idaho, New Hampshire, and Nevada also have evidence rules similar to the federal rule, but have relaxed those rules in sexual crime cases to allow the admission of extrinsic evidence of an accuser's prior false sexual crime allegation. *See, e.g., Morgan v. State,* 54 *P.*3d 332, 336 (Alaska Ct.App. 2002); *State v. Hutchinson,* 141 *Ariz.* 583, 688 *P.*2d 209, 212–13 (Ct.App.1984) (interpreting *State ex rel Pope v. Superior Court,* 113 *Ariz.* 22, 545 *P.*2d 946, 953 (1976)); *West v. State,* 290 *Ark.* 329, 719 *S.W.*2d 684, 686–87 (1986), *reh'g denied,* 290 *Ark.* 329, 722 *S.W.*2d 284 (1987); *State v. Schwartzmiller,* 107 *Idaho* 89, 685 *P.*2d 830, 833 (1984); *State v. Gordon,* 146 *N.H.* 258, 770 *A.*2d 702, 704–05 (2001); *Miller v. State,* 105 *Nev.* 497, 779 *P.*2d 87, 89–90 (1989).

Massachusetts and Oregon, which like New Jersey follow the common law rule, have recognized a limited exception to allow cross-examination of an accuser who has made a prior false sexual crime allegation when the case involves a similar crime, but disallow extrinsic evidence. *See, e.g., Commonwealth v. Bohannon,* 376 *Mass.* 90, 378 *N.E.*2d 987, 991 (1978); *State v. Driver,* 192 *Or.App.* 395, 86 *P.*3d 53, 55–58 (2004). Kansas, Georgia, Indiana, Louisiana, and Virginia, which also follow the common law rule prohibiting specific conduct evidence relating to character, have suggested that the defendant's right to confrontation in a sexual crime case allows cross-examination of the accuser-witness and the admission of extrinsic evidence to prove the witness's

prior false sexual crime accusation. *See, e.g., State v. Barber, supra,* 766 *P.*2d at 1290 (Kan.); *Smith v. State,* 259 *Ga.* 135, 377 *S.E.*2d 158, 160, *cert. denied,* 493 *U.S.* 825, 110 *S.Ct.* 88, 107 *L.Ed.*2d 53 (1989); *Little v. State,* 413 *N.E.*2d 639, 643–44 (Ind.Ct. App.1980); *State v. Smith,* 743 *So.*2d 199, 202 (La.1999); *Clinebell v. Commonwealth,* 235 *Va.* 319, 368 *S.E.*2d 263, 266 (1988).

Texas, which has an evidence rule similar to New Jersey's, has embraced a case-by-case analysis to determine whether a defendant's right to confrontation requires relaxation of the bar on specific conduct evidence in all cases in which an accuser has made a prior false criminal allegation—not just sexual crime cases. *See Lopez v. State,* 18 *S.W.*3d 220, 225 (Tex.Crim.App.2000) (declining "to create a *per se* exception to the Rule 608(b) for sexual offenses" because "[i]t makes no sense to say that certain factors will always be present in a case involving a sexual offense").

Some Federal Courts of Appeals that have addressed the use of a prior false accusation to undermine the credibility of an accuser-witness have determined that restrictions on the admissibility of extrinsic evidence do not violate the Sixth Amendment right to confrontation. *See, e.g., Boggs v. Collins,* 226 *F.*3d 728, 736–40 (6th Cir.2000), *cert. denied,* 532 *U.S.* 913, 121 *S.Ct.* 1245, 149 *L.Ed.*2d 152 (2001); *Hogan v. Hanks,* 97 *F.*3d 189, 191 (7th Cir.1996), *cert. denied,* 520 *U.S.* 1171, 117 *S.Ct.* 1439, 137 *L.Ed.*2d 546 (1997); *United States v. Bartlett,* 856 *F.*2d 1071, 1088–89 (8th Cir.1988).

Several jurisdictions have recognized that prior false accusations of sexual crimes by the accuser may be admissible for reasons unrelated to impeachment of general credibility—to prove the accuser's habit, state of mind, motive, or common scheme. *See, e.g., Peeples v. State,* 681 *So.*2d 236, 237–39 (Ala.1995) (habit); *People v. Hurlburt,* 166 *Cal.App.*2d 334, 333 *P.*2d 82, 87 (1958) (state of mind); *State v. Anderson,* 211 *Mont.* 272, 686 *P.*2d 193, 199, 201 (1984) (state of mind, motive, and bias). There is no evidential bar to such an approach in New Jersey, *see N.J.R.E.* 404(b), 608, but defendant in this case has presented no proof that

would remotely place the prior accusation within the realm of habit, intent, or common scheme.

Those jurisdictions that permit evidence of prior false criminal accusations in sexual crime cases condition the admissibility of such evidence on a preliminary judicial finding. Some jurisdictions require that the prior accusation be shown to be "demonstrably false." *See, e.g., Little, supra,* 413 *N.E.*2d at 643 (Ind.Ct. App.); *State v. Sieler,* 397 *N.W.*2d 89, 92 (S.D.1986); *Berry v. Commonwealth,* 84 *S.W.*3d 82, 91 (Ky.Ct.App.2001). Others have articulated varying standards of proof for determining whether the witness made the accusation and whether it was false: clear and convincing evidence, *Gordon, supra,* 770 *A.*2d at 704, 705 (N.H.); preponderance of the evidence, *Morgan v. State,* 54 *P.*3d 332, 339 (Alaska Ct.App.2002); or "a reasonable probability of falsity," *Smith, supra,* 377 *S.E.*2d at 160(Ga.); *Barber, supra,* 766 *P.*2d at 1290 (Kan.Ct.App.); *Clinebell, supra,* 368 *S.E.*2d at 266 (Va.). *See also Smith, supra,* 743 *So.*2d at 203 (La.) (stating judge must determine "whether reasonable jurors could find, based on the evidence presented by defendant, that the victim had made prior false accusations").

### III.

#### A.

We conclude that in limited circumstances and under very strict controls a defendant has the right to show that a victim-witness has made a prior false criminal accusation for the purpose of challenging that witness's credibility. Although our Confrontation Clause jurisprudence informs our decision, we do not decide this issue on constitutional grounds, but rather by making a narrow exception to *N.J.R.E.* 608 consistent with the rationale of that rule.

A witness's propensity for making false criminal allegations is admissible if presented in the proper form. For instance, under our evidence rules, a witness may testify in the form of an opinion

that the victim has a reputation for lying, and the defendant may argue from such testimony that the victim is, therefore, not worthy of belief. *N.J.R.E.* 608. Moreover, a criminal conviction may be used to impeach the witness for the purpose of drawing an inference that the witness's testimony is not as trustworthy as that of a person with a blameless past. *See N.J.R.E.* 608, 609. Both examples are permissible attacks on the general credibility of a witness; neither imposes the burden of a mini-trial.

That a victim-witness uttered a prior false accusation may be no less relevant, or powerful as an impeachment tool, than opinion testimony that the witness has a reputation for lying. Moreover, a prior criminal conviction for criminal mischief or aggravated assault probably has far less bearing on the trustworthiness of a victims testimony than a prior false accusation, but there is no question concerning the admissibility of the prior conviction. Yet, proving a prior false accusation—unlike presenting reputation testimony or evidence of a prior conviction—if not strictly regulated, could cause the very type of sideshow trial that *N.J.R.E.* 608 was intended to prevent. We are confident, however, that trial courts, with proper guidance and limitations, can decide appropriately when the admission of prior false accusation evidence is central to deciding a case that hinges on the credibility of a victim-witness. Trial courts are well qualified to determine when such evidence will create the prospect of a mini-trial and when the probative value of that evidence is outweighed by the risk of undue prejudice, confusion of the issues, or waste of time. *See N.J.R.E.* 403. In certain cases, we believe that the interests of justice require that we relax the strictures against specific conduct evidence in *N.J.R.E.* 608. The weight of authority from other jurisdictions generally favors that approach, though we chart a path consistent with our own jurisprudence and values.

We see no reason why prior false accusation evidence should be limited to cases in which the witness is the victim of a sexual crime. We, therefore, part from those jurisdictions that have modified their evidence rules, whether on constitutional or non-

constitutional grounds, only in sexual crime cases. We are not aware of any empirically-based evidence that sexual crime victim-witnesses are more likely to have made prior false criminal allegations than other crime victims. Limiting such evidence to sexual crime cases would only appeal to stereotypes that we have long since banished from our jurisprudence. *See* Denise R. Johnson, *Prior False Allegations of Rape: Falsus in Uno, Falsus in Ominibus,* 7 *Yale J.L. Feminism* 243, 247–64 (1995) (criticizing courts nationwide that distinguish between sexual crime cases and other cases when permitting use of prior false criminal accusations as character evidence).

## B.

We now must determine the circumstances that will justify the admission of prior false accusation evidence. First, we limit our holding to a criminal case that involves the impeachment of a victim-witness whose credibility was the central issue in the case. The trial in this case essentially was reduced to a credibility contest between the victim and defendant. Second, the introduction of the prior false accusation evidence cannot become the tail wagging the dog; that is, proof of the false accusation cannot become such a diversion that it overshadows the trial of the charges itself. On the one extreme, we will have the witness who admits the false accusation on cross-examination, averting the need for extrinsic evidence. *See Carter v. Hewitt,* 617 *F*.2d 961, 971 (3rd Cir.1980) (noting that "reasons for barring extrinsic evidence lose their force when the witness whose credibility is challenged concedes the alleged acts" because "no trial is needed since the matter is conceded"). At the other extreme, we will have the witness who claims that the prior accusation is true, in which case only a complete trial of that issue will determine the truth or falsity of the accusation. In keeping with the historical rationale for the common law rule now codified in *N.J.R.E.* 608, we disfavor using the trial of charged offenses as the forum for an

extended mini-trial for the collateral determination of a prior criminal accusation.

## C.

In deciding whether to permit the impeachment of a victim-witness who allegedly made a prior false accusation, trial courts must first conduct an admissibility hearing pursuant to *N.J.R.E.* 104. At that hearing, the court must determine by a preponderance of the evidence whether the defendant has proven that a prior accusation charging criminal conduct was made by the victim and whether that accusation was false. That standard strikes the right balance, placing an initial burden on the defendant to justify the use of such evidence while not setting an exceedingly high threshold for its admission. We note that the admission of this type of specific conduct evidence is an exception to *N.J.R.E.* 608 and should be limited only to those circumstances in which the prior accusation has been shown to be false. Among the factors to be considered in deciding the issue of admissibility are:

1. whether the credibility of the victim-witness is the central issue in the case;

2. the similarity of the prior false criminal accusation to the crime charged;

3. the proximity of the prior false accusation to the allegation that is the basis of the crime charged;

4. the number of witnesses, the items of extrinsic evidence, and the amount of time required for presentation of the issue at trial; and

5. whether the probative value of the false accusation evidence will be outweighed by undue prejudice, confusion of the issues, and waste of time.

If the court, pursuant to its gate-keeping role, determines that evidence of the prior false accusation is admissible, the court has the discretion to limit the number of witnesses who will testify concerning the matter at trial. The court must ensure that testimony on the subject does not become a second trial, eclipsing the trial of the crimes charged.

## D.

Whether defendant in this case may introduce evidence of D.F.s previous false criminal accusation is a matter for the sound discretion of the trial court on remand at a *N.J.R.E.* 104 hearing. We do make these observations, however, regarding the issues that will face the trial court. The State has argued that any presentation of the false accusation issue at trial will require no less than nine witnesses. We disagree based on our review of the letters from the two school officials. D.F. allegedly told two classmates at her middle school, J.O. and D.D., that a neighbor had sexually abused her. J.O. and D.D. reported what they had learned from D.F. to a counselor, Mary Ellen Cordisco. Ms. Cordisco then met with D.F. in the presence of J.O. and D.D. At that meeting, although D.F. at first denied ever telling J.O. and D.D. that she had been sexually abused by her neighbor, she finally admitted that she told the story and that it was a lie. That same day, Vice Principal Johan E. de Brigard questioned D.F. in the presence of Ms. Cordisco and her two classmates. Ms. de Brigard disclosed to D.F. what she had learned. At that time, D.F. became upset that J.O and D.D. had revealed such intimate information to others. D.F. confessed that what she told her classmates concerning the sexual abuse by her neighbor "was a lie."

Assuming that Ms. Cordisco and Ms. de Brigard testify consistently with the letters they forwarded to the Ocean County Prosecutors Office, their testimony alone, if believed, would be sufficient to establish that D.F. made an accusation of a criminal nature that she knew to be false. If D.F. admits to making the false accusation, then there would be no need for the defense to call any witnesses to prove the point. Of course, D.F. would have the opportunity to give an explanation for making the false report. On the other hand, if D.F. denies ever making the allegation to J.O and D.D., as she did when questioned by members of the prosecutors office, then defendant could rebut that testimony by calling the two school officials. We give this guidance for the

purpose of suggesting that it is possible to present this issue economically, without calling redundant witnesses, confusing the issues and causing a sideshow. Of course, we have before us only a documentary record, and the trial court on remand, in determining admissibility, must take testimony and make the appropriate findings from that testimony.

### E.

In this case, we are not creating a new rule of evidence, but merely carving out a narrow exception to the common law rule embodied in *N.J.R.E.* 608 for the purpose of permitting the jury to consider relevant evidence—in clearly defined circumstances—that may affect its estimation of the credibility of a key witness. As noted, many jurisdictions already allow the impeachment of a witness who has made a prior false criminal accusation. *N.J.R.E.* 102 tells us that our codified rules of evidence "shall not bar the growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." We have recognized that our constitutional authority over the practice and procedure in the courts empowers us to make adjustments to the evidence rules "on a unilateral basis" when the fairness and truth-seeking function of a trial will be enhanced. *Jacober v. St. Peter's Med. Ctr.*, 128 *N.J.* 475, 494, 608 *A.*2d 304 (1992).

In *Jacober*, we adopted the federal formulation of the learned treatise rule, allowing the admission into evidence of an authoritative treatise or text that has been established as a reliable authority "by expert testimony or by judicial notice." *Id.* at 478, 498, 608 *A.*2d 304. Before *Jacober*, learned treatises were used to impeach an expert witness's credibility on cross-examination only when that witness cited to the treatise in his report or testimony or conceded on cross-examination that the treatise was an authority in the field. *See Ruth v. Fenchel*, 21 *N.J.* 171, 175–76, 179, 121 *A.*2d 373 (1956). In *Jacober*, we stated that "[a]lthough the Evidence Act provides the usual mechanism for adopting new

rules, certain areas of evidence law 'will continue to develop on a case-by-case decisional basis.'" *Id.* at 493, 608 *A.*2d 304 (quoting V. Biunno, *Current N.J. Rules of Evidence,* Preliminary Comments at xvii (1991)). We cited former *Evidence Rule* 5 (now *N.J.R.E.* 102) for the proposition that "[t]he adoption of [the *Rules of Evidence*] shall not bar the growth and development of the law of evidence in accordance with fundamental principles to the end that the truth may be fairly ascertained." *Ibid.* We also drew a distinction between creating a new rule of evidence and "modifying a pre-existing common-law rule." *Id.* at 494, 608 *A.*2d 304. The limited exception to *N.J.R.E.* 608 that we now recognize will enhance the truth-seeking function of the trial and is a proper subject of this Court's jurisdiction because of our constitutional responsibility to ensure that trials achieve reliable and just outcomes. *See N.J. Const.* art. 6, § 2, ¶ 3 ("The Supreme Court shall make rules governing the administration of all courts in the State and, subject to the law, the practice and procedure in all such courts.").

We have held that significant changes to the *Rules of Evidence* "should be adopted in accordance with the prescribed statutory procedure." *State v. D.R.,* 109 *N.J.* 348, 352, 375–76, 537 *A.*2d 667 (1988) (holding Appellate Division's unilateral adoption of new evidence rule inappropriate given "serious and far-reaching nature of the rule"). The exception to *N.J.R.E.* 608 that we recognize in this opinion is limited to the impeachment of a victim-witness whose credibility is the central issue in a criminal case. Whether the use of a prior false criminal allegation to impeach credibility should have wider application in other circumstances is a matter that "would benefit from more deliberate study." *Id.* at 376, 537 *A.*2d 667. Accordingly, we refer that issue for review to this Court's standing Committee on the Rules of Evidence for any recommendations to this Court not inconsistent with this opinion.

## IV.

We, therefore, affirm the judgment of the Appellate Division and remand for a hearing to determine the admissibility of the

prior false criminal accusation alleged to have been made by D.F. If the trial court finds that evidence of the prior accusation should have been admitted pursuant to the standards set forth in this opinion, then a new trial shall be granted. If the evidence of the prior accusation is deemed inadmissible, then the conviction shall stand. This matter is remanded to the trial court for proceedings consistent with this opinion.

*For affirmance*—Chief Justice PORITZ and Justices VERNIERO, LaVECCHIA, ZAZZALI, ALBIN and WALLACE—6.

*Opposed*—None.