# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4141-16T3

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ANTHONY M. JACKSON,

     Defendant-Appellant.

_____

> Argued October 29, 2018 – Decided November 26, 2018
>
> Before Judges Sabatino, Haas and Sumners.
>
> On appeal from Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 11-05-0479.
>
> Michael J. Confusione, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Michael J. Confusione, on the brief).
>
> Andre R. Araujo, Assistant Prosecutor, argued the cause for respondent (Jennifer Webb-McRae, Cumberland County Prosecutor, attorney; Andre R. Araujo, of counsel and on the briefs).

Appellant filed a pro se supplemental brief.

PER CURIAM

After a jury trial in 2016, defendant Anthony M. Jackson was found guilty of second-degree sexual assault as to victim D.B.,[1] N.J.S.A. 2C:14-2(c)(1) (count seven); second-degree aggravated assault attempting or causing serious bodily injury upon another victim, S.P., N.J.S.A. 2C:12-1(b)(1) (count five); third-degree aggravated assault attempting or causing significant bodily injury upon D.B., N.J.S.A. 2C:12-1(b)(7) (count six); two counts of third-degree criminal restraint as to both D.B. and S.P., N.J.S.A. 2C:13-2(a) (counts one and two); fourth-degree criminal trespass, N.J.S.A. 2C:18-3(a) (count three); third-degree possession of a weapon (a baseball bat) for an unlawful purpose, N.J.S.A. 2C:39-4(d) (count twelve); and fourth-degree unlawful possession of weapon (a baseball bat), N.J.S.A. 2C:39-5(d) (count ten). The jury found defendant not guilty of various other charged offenses, including kidnapping and robbery.

The court sentenced defendant to an extended custodial term of sixteen years for the sexual assault of D.B., subject to a parole disqualifier under the No Early Release Act ("NERA"), N.J.S.A. 2C:43-7.2, plus an eight-year consecutive term for the second-degree aggravated assault of S.P., also subject

---

[1] We use initials to protect the identities of the victims.

to NERA. Defendant's sentences on the remaining charges were either merged or ordered to run concurrently.

Defendant's main argument on appeal is that the trial court misapplied N.J.R.E. 608(b) when it precluded his trial counsel from presenting evidence to the jury that D.B. had made similar, allegedly false, accusations of sexual assault against him in a 2005 criminal matter and later recanted. As a related point, defendant argues that N.J.R.E. 608(b) unconstitutionally curtails an accused's rights of confrontation, in allowing a judge to bar such prior false accusation evidence based on the judge's own assessment that the impeachment evidence is untrue, even if reasonable jurors might find it to be credible. Apart from these points involving N.J.R.E. 608(b), defendant presents various other arguments in his appellate counsel's brief and his pro se supplemental brief. We affirm.

I.

The evidence at the eleven-day trial may be summarized as follows. On the whole, the evidence concerned a violent encounter between defendant, his former girlfriend D.B., and D.B.'s adult son, S.P., who lived with D.B. at her home.

On the date of the incident, July 27, 2010, D.B. arrived home from work at approximately at 12:30 a.m. and S.P. was in his room when D.B. arrived.

D.B. had been in an on-and-off romantic relationship with defendant for several years. As of the time of the incident, defendant and D.B. were not in a relationship, and defendant was not welcome in D.B.'s home. According to D.B., she and defendant had broken up approximately six weeks earlier.

D.B. testified that she was awakened in her room by a noise at approximately 4:00 a.m. According to D.B., when she awoke, she saw S.P. run into her room and she also saw defendant. After S.P. ran into her room, she began to yell at defendant and ask what he was doing there. According to D.B., defendant then punched S.P. An altercation involving defendant, D.B., and S.P. ensued, in which all three persons wound up on the floor. D.B. attempted to call 9-1-1, but defendant took the phone out of her hands.

According to D.B., defendant then hit S.P. in the head with a baseball bat that D.B. kept in her room, which knocked him down. S.P. stayed down, and defendant would not allow D.B. to check on her son to see how badly he was hurt. D.B. stated that S.P. was quiet, but that she knew defendant had hit S.P. in the head with a baseball bat. D.B. recalled she could see a blood stain near S.P. on the floor grow in size. According to D.B., defendant tied up S.P., closed the door, and locked the three of them in her bedroom.

A-4141-16T3

D.B. further testified that, after defendant subdued her son, he forced her onto her bed. She claimed he repeatedly sexually assaulted her vaginally, anally, and orally. This described sexual assault occurred both on D.B.'s bed and on the floor.

According to D.B., defendant would not allow her to leave the room to even go to the bathroom. Rather, she said he forced her to urinate in a coffee cup. The assault occurred over the course of several hours, from approximately 4:00 a.m. until about 7:30 a.m., or around the time the sun was rising. She recalled that S.P. was laying on the floor during the sexual assault, bleeding from his head wound.

S.P.'s trial testimony substantially echoed the testimony of his mother, D.B. S.P. stated that, after he was hit by defendant the second time, he stayed on the ground "playing possum." S.P. explained that he stayed down because he "wasn't sure what [defendant] would do if [S.P.] got back up." S.P. testified that he could hear defendant forcing himself on his mother and her begging him to stop.

According to S.P., he was not the aggressor. The first time defendant hit him was with his fist. S.P. described the second hit to the back of his head as something that "dug into [his] head." S.P. stated defendant also hit him in his

abdomen with a baseball bat. Defendant then allegedly tied him up after assaulting him. S.P. testified he heard defendant sexually assaulting his mother "for hours," while he was tied up on the floor. S.P. further recounted that defendant made D.B. perform oral sex on S.P. S.P. kept his eyes closed when this happened.

D.B. and S.P. each testified they were allowed out of the room around the time that the sun came up. D.B. stated that defendant then forced her to help him clean up the scene by washing the sheets and their clothing and by wiping surfaces with Lysol.

At approximately 9:00 a.m., D.B. called out sick from work, while defendant sat next to her. Later, around 10:00 a.m., a job coach came to the door of her home to pick up S.P. to assist him in looking for work. Defendant went to the door and told the job coach that S.P. would not be going out that day, and the job coach left.

At about 11:00 a.m., defendant said he needed to leave, but that he wanted money first. Defendant consequently forced D.B. to drive him to a nearby bank to retrieve money for him from an ATM. D.B. testified that defendant made S.P. come with them in the car, and told S.P. to stay in the back seat.

A-4141-16T3

According to D.B., after she withdrew funds from the bank and gave them to defendant, he allowed her to drop him off somewhere near her home. She then drove home with S.P. D.B. locked the doors and called a close friend for help, while her son called his grandfather, D.B.'s father. S.P.'s grandfather arrived at D.B.'s house shortly thereafter and contacted the police. The police came to the house, as well as emergency medical technicians.[2]

Both D.B. and S.P. were treated for their injuries and taken to the hospital. According to an EMS worker, S.P. had a one-and-a-half-inch semicircular laceration to the back of his head and a large lump on his forehead, as well as abrasions and lacerations to his arms, legs, and stomach.

On cross-examination, S.P. acknowledged that although he had told a police detective that he saw the assault of his mother occur through a "window," such a window did not exist. S.P. clarified that he meant to say to the officer that he saw the assault through a mirror, not a window. Defense counsel also elicited some confusing testimony from S.P. on cross-examination as to whether he had been conscious during the alleged assault of his mother.

---

[2] Key aspects of defense counsel's attempts to impeach of D.B. are discussed in more depth, infra, in Part II(A).

A-4141-16T3

Dr. Tanvi Kothari was called by the State as an expert witness in forensic serology. Dr. Kothari testified that she found staining that was "presumptive positive for [the] presence of blood" on five pieces of paper towel found in D.B.'s car. Dr. Kothari opined that the swab taken from defendant's left-hand nail beds was presumptively positive for blood. Dr. Kothari further testified to having found two small droplets of what was suspected to be blood stain on the barrel of the baseball bat. The testing of these areas gave Dr. Kothari a "weak positive [blood] result."

The State also presented testimony at trial from Jennifer Thayer, a DNA comparison expert. Thayer testified that the DNA sample taken from the blood stain on the baseball bat matched the DNA profile of D.B. According to Thayer, S.P. was "the major DNA profile contributor" for the general swab of the baseball bat. Moreover, Thayer testified that D.B.'s DNA had been found on the paper towels located in D.B.'s car.

Defendant testified on his own behalf and denied assaulting either D.B. or S.P. He also presented testimony from his mother and a cousin, neither of whom had been in the residence when the alleged attacks on D.B. and S.P. occurred.

The defense theme at trial was that D.B. and defendant had a turbulent, on-and-off-again romantic relationship for years. The tempestuous relationship

8

and fluctuating emotions, defense counsel argued, resulted in D.B.'s and S.P.'s inconsistent and contradictory trial testimony.

Defendant contended that he had come to D.B.'s house for a benign purpose, to try to persuade her to resume their relationship. Defendant testified he did not break into the residence, but rapped on a window, and S.P. woke up and let him inside the residence through a door. Moreover, defendant contended that he only struck S.P. in self-defense after S.P. swung at him.

Among other things, defense counsel stressed in closing argument that defendant's fingerprints were not found on the window, that D.B.'s DNA was not found on the handle baseball bat, that D.B. did not seek help from anyone at the bank or act in distress, and that S.P. did not run out of the car when his mother went inside the bank. Nevertheless, the jury apparently credited the State's proofs on most, but not all, of the charged offenses.

On appeal, defendant raises the following points in his counsel's brief:

> POINT 1
>
> THE TRIAL COURT ERRED AND VIOLATED DEFENDANT'S RIGHT TO CONFRONT THE WITNESS AGAINST HIM BY LIMITING CROSS-EXAMINATION OF THE MAIN WITNESS, D.B.

POINT 2

THE PROSECUTOR EXCEEDED FAIR COMMENT IN SUMMATION.

POINT 3

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR JUDGMENT NOTWITHSTANDING VERDICT.

POINT 4

DEFENDANT'S SENTENCE IS IMPROPER AND EXCESSIVE.

Defendant also makes these arguments in a pro se supplemental brief:

POINT I

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN OF [SIC] DENYING DEFENDANT OF A FAIR TRIAL WHEN HE VIOLATED THE CANNON OF RULES AND FAILED TO RECUSE HIMSELF ON (2) OCCASSIONS.

POINT II

THE TRIAL COURT ERRED WHEN IT ALLOWED THE PROSECUTOR TO COMMIT PROSECUTORIAL MISCONDUCT WHEN PROSECUTOR MISLED THE JURY COMMENTING ON-MATTERS OUTSIDE THE EVIDENCE "IN THE RECORD." THE EVIDENCE AND /OR MATTERS WHICH WERE "ESOTERIC" AND REQUIRED EXPERT TESTIMONY WHICH CONSTITUTED REVERSIBLE ERROR.

POINT III

DEFENDANTS SIXTEEN YEAR EXTENDED TERM SENTENCE AND EIGHT YEAR CONSECUTIVE IS MANIFESTLY EXCESSIVE AND UNDULY PUNITIVE. NOT SUPPORTED BY A QUALITATIVE WEIGHING OF THE AGGRAVATING AND MITIGATING FACTORS AND MUST BE VACATED OR THE MATTER REMANDED FOR RESENTENCING.

POINT IV

THE PROSECUTOR INTERFERED WITH THE GRAND JURY DECISION MAKING PROCESS BY WITHHOLDING EVIDENCE THAT BOTH NEGATES GUILT AND IS CLEARLY EXCULPATORY.

POINT V

THE PROSECUTOR NEVER PROVED AT TRIAL A. JACKSON POSSESSE[D] A BAT, SEXUALLY ASSAULTED- [D.B.], CRIMINAL RESTRAINT, CRIMINAL TRESPASS, AND AGGRAVATED ASSAULT UPON [D.B.] AND [S.P.]. THE CONVICTIONS MUST BE VACATED BECAUSE THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT THE ESSENTIAL ELEMENTS THAT HE POSSESSE[D] BAT, CRIMINAL RESTRAINT, SEXUAL ASSAULT, AGGRAVATED ASSAULT[S].

A. THE VERDICT ON THE COUNT SEXUAL ASSAULT, WAS PATCHWORK AND SHOULD BE REVERSED BASED ON LACK OF EVIDENCE. "CONVICTION BASED UPON [D.B.] SAYING SHE KNOWS ME . . . YET REFUSED RAPE KIT, AND

11

HER SON TESTIFYING HE FIRST SEEN ME THROUGH AN IMAGINARY WINDOW IN THE MIDDLE OF ROOM, THEN BROKEN MIRROR, THEN STATING HE SEEN [SIC] NOTHING BUT HEARD SOMETHING.

POINT VI

DEFENDANT ARGUES INEFFECTIVE COUNSEL BECAUSE ATTORNEY FAILED TO CALL KEY WITNESSES THAT WERE PARTIES TO INCIDENT AND WHOM TESTIMONY WAS VITAL TO HIS DEFENSE AND TRIAL.

II.

A.

Defendant's primary argument on appeal concerns the trial court's application of N.J.R.E. 608(b), and the court's decision after a Rule 104 hearing to exclude impeachment evidence that defense counsel had proffered of D.B. allegedly making similar false accusations of sexual assault against defendant in the past. Defendant further argues that N.J.R.E. 608(b) unconstitutionally curtails his constitutional rights of confrontation.

For the reasons that follow, we are unpersuaded the court erred in its application of N.J.R.E. 608(b), or that the terms of the Rule violate the Confrontation Clause.

A-4141-16T3

1.

N.J.R.E. 608, entitled "Evidence of Character for Truthfulness or Untruthfulness and Evidence of Prior False Accusation," provides:

> (a) The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, provided, however, that the evidence relates only to the witness' character for truthfulness or untruthfulness, and provided further that evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise. Except as otherwise provided by Rule 609 and by paragraph (b) of this rule, a trait of character cannot be proved by specific instances of conduct.
>
> (b) The credibility of a witness in a criminal case _may be attacked_ by evidence that the witness made _a prior false accusation_ against any person of a crime similar to the crime with which defendant is charged _if the judge preliminarily determines, by a hearing pursuant to Rule 104(a), that the witness knowingly made the prior false accusation_.
>
> [N.J.R.E. 608 (emphasis added).]

Subsection (b) of the rule became effective in 2007, following the Supreme Court's opinion in State v. Guenther, 181 N.J. 129 (2004), recommending the adoption of an evidence rule authorizing the admission of certain such impeachment proof in criminal cases.

A-4141-16T3

In Guenther, a defendant sought to admit evidence that a crime victim had previously admitted to falsely accusing her neighbor of sexually abusing her. Id. at 131. The defendant was charged with sexual assault and other crimes related to the abuse of his stepdaughter. Ibid. The Court observed that N.J.R.E. 608 "embodies the common law rule that generally forbids admission of specific instances of conduct to attack a witness's character for truthfulness." Id. at 131-32. Despite this common-law tradition, the Court considered in Guenther the discrete question of "whether the credibility of a witness who has accused a defendant of sexual abuse may be impeached by evidence that she made a prior false criminal accusation [and] . . . whether that issue implicates a defendant's state and federal constitutional right of confrontation." Id. at 132.

Guenther recognized that, "[s]everal centuries ago, courts began to prohibit the use of prior instances of conduct to attack the credibility of a witness for two essential reasons: to prevent unfairness to the witness and to avoid confusion of the issues before the jury." Id. at 141. Consistent with that long-standing practice, the Court noted that N.J.R.E. 608 "was designed to prevent unfair foraging into the witness's past, as well as unfair surprise." Ibid. In addition, "[t]he second rationale for the bar on specific conduct evidence was the concern that such wide-ranging collateral attacks on the general credibility

14

of a witness would cause confusion of the true issues in the case."  Id. at 141-42.  The Court observed that:

> Modern courts continue to cite that rationale – the avoidance of "minitrials" on collateral matters that "tend to distract and confuse the jury" – as the primary justification for the exclusion of prior acts evidence.  It was not a lack of relevance that gave rise to the rule prohibiting evidence of prior instances of untruthful conduct to impeach the witness's credibility, but the "auxiliary policies" regarding unfairness to the witness, confusion of issues, and undue consumption of time.
>
> [Id. at 142 (emphasis added) (citation omitted).]

On the other hand, Guenther recognized the importance of a criminal defendant's countervailing right to confrontation.  Id. at 147.  The Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution both guarantee criminal defendants a general right to confront witnesses against them and "to have compulsory process for obtaining witnesses in [their] favor."  U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10. Guenther recognized these constitutional rights, and observed that both rights are "essential for a fair trial." Id. at 147.  Additionally, the Court acknowledged that a defendant's right to confrontation is commonly exercised through cross-examination, "which is recognized as the most effective means of testing the State's evidence and ensuring its reliability."  Ibid.

A general attack on a witness's credibility occurs when cross examination seeks to reveal possible biases, ulterior motives, and prejudices. Id. at 149. The Court noted in this regard that the United States Supreme Court in Davis v. Alaska, 415 U.S. 308, 316-17 (1974), "recognized that the exposure of a witness motivation [such as bias] in testifying is a proper and important function of the constitutionally protected right of cross-examination." Ibid.

Given these competing considerations, the Court in Guenther adopted a limited exception in New Jersey for the admission, in criminal cases, of certain impeachment evidence of a victim's prior false accusations against defendant of a similar criminal act. In doing so, the Court attempted to strike a balance between a criminal defendant's right of confrontation and the interests of victim-witnesses. Id. at 157.

Procedurally, the Court in Guenther directed that "[i]n deciding whether to permit the impeaching of a victim-witness who allegedly made a similar false accusation in the past, trial courts must first conduct an admissibility hearing pursuant to N.J.R.E. 104." Ibid. "At that hearing, the court must determine by a preponderance of the evidence whether the defendant has proven that a prior accusation charging criminal conduct was made by the victim and whether that accusation was false." Ibid. The Court concluded this procedural approach

16

"strikes the right balance, placing an initial burden on the defendant to justify the use of such evidence while not setting an exceedingly high threshold of its admission." Ibid.

Guenther instructed that in situations where such a preliminary determination is made following a Rule 104 hearing, various factors should then guide whether the prior false accusation would be admissible. "[T]he admission of this type of specific conduct evidence is an exception to N.J.R.E. 608 and should be limited only to those circumstances in which the prior accusation has been shown to be false." Ibid. (emphasis added). The Court listed in Guenther the admissibility factors to be considered, as follows:

> 1. whether the credibility of the victim-witness is the central issue in the case;
>
> 2. the similarity of the prior false accusation to the crime charged;
>
> 3. the proximity of the prior false accusation to the allegation that is the basis of the crime charged;
>
> 4. the number of witnesses, the items of extrinsic evidence, and the amount of time required for presentation of the issue at trial; and
>
> 5. whether the probative value of the false accusation evidence will be outweighed by undue prejudice, confusion of the issues, and waste of time.
>
> [Ibid.]

Guenther directed the Supreme Court Committee on Evidence to consider drafting a proposed amendment to the New Jersey Rules of Evidence to codify such a "false accusation" provision. Id. at 160.

The Evidence Committee initially recommended that the new provision be extended to civil cases as well as criminal cases, and that organizationally the provision be inserted into N.J.R.E. 609 (regarding impeachment with previous criminal convictions) rather than within N.J.R.E. 608 (regarding other forms of witness impeachment). The Committee's April 4, 2006 Report contingently advised, however, that if the Court did not wish to extend the new provision to civil cases and confine it only to criminal cases, the provision should read as follows:

> For the purpose of affecting the credibility of any witness, the witness's prior false accusation against any person of a crime similar to the crime with which defendant is charged shall be admissible if the judge preliminarily determines, by a hearing pursuant to Rule 104(a), that the prior accusation was made and was false.
>
> [Supreme Court Committee on the Rules of Evidence, Report on Prior False Accusation Evidence 3 (Apr. 4, 2006).]

The Committee's April 2006 recommendation did not place the "Guenther factors" within the text of the Rule, but instead envisioned those factors would be applied by trial judges in implementing the new provision.

The Supreme Court thereafter decided to confine the new provision to criminal cases, and also to place the provision organizationally within N.J.R.E. 608 rather than N.J.R.E. 609. See Supreme Court Committee on the Rules of Evidence, Proposed Amendment to N.J.R.E. 609 to Permit Evidence of Prior False Accusations 11 (Jan. 19, 2007). Among other things, the Court inserted the adverb "knowingly" as a required facet of the witness's previous state of mind in making a false accusation. The Court also replaced the Committee's suggested phrasing that such proof "shall be admissible" if the predicates are met, with the phrase "may be attacked."[3]

2.

We turn to the trial court's application of N.J.R.E. 608(b) in the present case. Before trial, defense counsel advised the court that the defense intended to present evidence under N.J.R.E. 608(b) of D.B.'s alleged false accusations of sexual assault against defendant in 2005, as proof to impeach her credibility in

---

[3] We need not decide whether the Court's linguistic change from "shall" to "may" signifies that the application of the Rule is discretionary rather than mandatory.

this case. In July 2016, the trial court, following the procedure set forth under the Rule, conducted a Rule 104 hearing. Defense counsel called D.B. as a witness at that hearing.

D.B. acknowledged in her testimony at the Rule 104 hearing that she had been in a relationship with defendant in the past. She further acknowledged that she had given statements to the police and testified in 2005 in a criminal prosecution of defendant that he had sexually assaulted her. D.B. specifically testified that she told law enforcement in 2005 that defendant committed an act of sexual penetration on her, against her will. Defendant was ultimately convicted of criminal activity arising out of those allegations.

Notably, D.B. admitted at the Rule 104 hearing to having written and signed two letters to the trial court in July 2005 and October 2006 with the purpose of "trying to attempt to get [defendant]'s charges reduced." D.B. also acknowledged to having written a letter to the Parole Board for "[t]he same reasons." Although defendant had already been sentenced on these charges by that point, she explained that she wrote these letters because she was "[t]rying to get his charges not as severe."

D.B. stated at the Rule 104 hearing that she had intended to convey in her 2006 letter to the Parole Board her view that defendant was innocent of criminal

restraint, but not that he was innocent of sexual assault or contact. According to D.B., she typed and signed the letters, but defendant guided her on the phone from jail as to "what to write." D.B. testified she was unable to remember if she signed the certification that defense counsel presented to her, which stated that the previously referenced letters were true and correct. D.B. testified at the hearing that she wrote the letters "because [she] wanted [defendant] charged with just simple assault."

During the <u>Rule</u> 104 hearing, defense counsel specifically asked D.B. whether defendant had sexually assaulted her in 2005. D.B. replied, "Yes." Defense counsel followed up by asking, "[defendant] sexually assaulted you [then]?" To which D.B. responded, "He did."

When cross-examining D.B. at the <u>Rule</u> 104 hearing, the assistant prosecutor had the following exchange with her regarding her alleged recantation:

> Q    [D.B.], what you reported to police in January 2005, was that the truth?
>
> A    Yes.
>
> Q    And these letters that you wrote to the Parole Board, was your only purpose to assist him in getting a lesser sentence?
>
> A    Yes.

A-4141-16T3

Q But it is the truth that he did, in fact, sexually assault you?

A Yes, it is.

After hearing argument from counsel, Judge D'Arrigo denied defendant's motion to admit false accusation evidence under N.J.R.E. 608(b). The judge provided his reasoning in a detailed oral opinion, as follows:

> Now to the extent that Guenther sets out the factors that would make this information, I guess, fair fodder for cross-examination, those determinations are only made after the [c]ourt finds that there was, by a preponderance of the evidence, a false allegation made against this defendant by this witness, or by – actually, a false allegation made by this witness against anybody. That is really what the rule is talking about here, not necessarily just this defendant.

> That said, this case is unique in that we have a great deal of information related to exactly the issue that counsel is pointing at in this application. As I indicated this is [an N.J.R.E.] 608(b) issue, not [one arising under N.J.R.E.] 803. So under the circumstances, the rules sets forth that credibility of a witness in a criminal case may be attacked by evidence that a witness made a prior false accusation against any person of a crime similar to the crime for which the defendant is charged. If the judge preliminarily determines by a – by a hearing, pursuant to Rule 104(a), that the witness knowingly made a prior false accusation.

> In this particular case, it is clear that even at the date of sentencing in the original offense back in 2005, this particular victim was owing to her relationship with

22

. . . defendant, not in agreement with the [p]rosecutor as to the nature of the prosecution. That means in the degree and extent of charges. She reiterated that here today.

I am satisfied, from her testimony here today, number one, that the testimony she gave . . . [t]o law enforcement previously and particularly with regard to the DV hearing, was in fact truthful testimony. I do not find that anything indicates that any of the testimony that she gave previously, or the statements she made to police, or the accusations that she made were not truthful.

That said, it is clear that she signed certain documents at the behest of the defendant, the one of which, the most troubling of which, of course, is the certification. As pointed out by counsel under cross-examination, the document on its face says [that] it's being made under oath. The victim is a well-educated person, able to read and understand the English language. So it's not as if she did not understand it. But significantly, the documents she looked at other than the certification, she freely admitted that she had typed, albeit at the request and/or instruction of . . . defendant . . . [.]

After examining the documents at issue, i.e., D.B.'s letters and certification, the judge found:

There is a consistency of typeface and organization with regard to D-2, D-3, D-5, and D-6. The one document that is substantially different both in typeface and organization is D-4, the certification.

Now all of these things – and what I'm – my decision with regard to this is predicated upon a totality

of circumstances here, all the things that present here to me with regard to the accusations made back in January of 2005. And what I have in front of me here is with regard to her testimony here today, she indicates that she did not recall typing the certification, under D-4, but she did recall typing the other correspondence.

She is aware, and I find that she does understand what perjury is. However, I do find that the motivation behind all of these documents was as she had stated, both at the time of her testimony here today and before [the judge who presided over the previous case] was to lessen the severity of the charges against . . . defendant. That was the primary purpose behind these documents.

That said, the other factors that I have in front of me are this, is that the charges were made back in January of 2005, and . . . defendant entered a plea of guilty to the criminal restraint. The references in all of these documents refer to both the criminal restraint and the sexual assault does not differentiate between the two of them.

I mirror [the prior judge's] observations that he had never seen anything like that before. I have never seen anything like that, per se, at sentencing. However, have I seen situations where persons in domestic relationships are reticent about proceeding in actions against a paramour or former paramour. No, that is extremely common. It happens all the time. <u>So the question here before me is was she lying when she made the accusations at the time they were made. And I do not find that there is evidence, by a preponderance of the evidence, that those statements were untrue</u>.

[(Emphasis added).]

24                                                                A-4141-16T3

Having determined that D.B. had not, in fact, made prior false accusations against defendant, Judge D'Arrigo found no need to reach definitively whether the Guenther factors were satisfied, although the judge stated in passing they "probably would be."

3.

Defendant argues the judge's conclusion of non-admissibility under N.J.R.E. 608(b) was erroneous and is not supported by the record. We disagree.

In evaluating defendant's contention of error, we must be mindful of the strong degree of deference we generally accord to criminal trial judges in their rulings on evidential admissibility. Such rulings generally "should be upheld 'absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment.'" State v. J.A.C., 210 N.J. 281, 295 (2012) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). "An appellate court applying this standard 'should not substitute its own judgment for that of the trial court, unless the trial court's ruling is so wide of the mark that a manifest denial of justice results.'" J.A.C., 210 N.J. at 295 (quoting Brown, 170 N.J. at 147).

No such "manifest denial of justice" or clear error has been demonstrated here. The testimony of D.B. at the Rule 104 hearing reasonably explains why she signed a certification and letters attempting to reduce defendant's criminal

exposure in the previous sexual assault case. As the judge found, D.B. credibly stated that she had only done so at defendant's request, and that she still maintains that he sexually assaulted and penetrated her. Viewing the totality of circumstances, the trial judge reasonably concluded that D.B. had not fully or definitively recanted her original accusations, and that no "knowingly false" assertions of wrongdoing by her had occurred. We affirm that sound determination.

4.

We now turn to defendant's alternative argument that N.J.R.E. 608(b) is unconstitutional, insofar as it allows a trial judge to bar evidence of a victim-witness's prior false accusation the judge finds unpersuasive, even though rational jurors might disagree with such a finding. For historical context, we are aware that the New Jersey Supreme Court's opinion in Guenther, which was issued on August 9, 2004, does not discuss the March 8, 2004 opinion of the United States Supreme Court in Crawford v. Washington, 541 U.S. 36 (2004), which substantially changed Confrontation Clause jurisprudence in our country. The key innovation of Crawford, however, which focuses on whether a declarant's hearsay statement afforded at trial against a criminal defendant is

"testimonial," id. at 51, has no bearing on the validity of N.J.R.E. 608(b) or, for that matter, the present case.

As Guenther recognized, following the common law tradition, not all states permit an accused to admit proof of specific instances of prior similar false accusations by a victim-witness. Guenther, 181 N.J. at 151. Some states do allow such false-accusation proof, but differ as to whether it can be adduced only through cross-examination of the victim-witness, or whether it can be separately proven through extrinsic evidence. Id. at 151-54. Our Court in Guenther elected to join the jurisdictions that permit such impeachment evidence in certain circumstances.

The critical flaw in defendant's argument of unconstitutionality is that our Supreme Court in Guenther, and in its later adoption of N.J.R.E. 608(b), endeavored to advance, not weaken, a defendant's interests in confrontation, by now allowing "false accusation" evidence to be used as impeachment in certain limited situations where it previously could not be used before in this State. By taking that step, the Court moved in the direction of a criminal defendant's interests in confrontation. But the Court was not constitutionally obligated to do so.

Indeed, defendant points to no federal or state court opinion that supports his novel argument that state rules of evidence must allow such proof to be admitted without the trial court performing a "gatekeeping" role in determining whether the likely probative value of such evidence justifies its consideration by a jury. Such gatekeeping appropriately takes into account the competing interests in avoiding "mini-trials" on collateral matters, juror confusion, and the need to avoid discouraging some victim-witnesses from coming forward to report new offenses. See Guenther, 181 N.J. at 142.

In State v. A.O., 198 N.J. 69, 74 (2009), the Court extended the Guenther exception to a witness's false allegations made after the allegations in the criminal case at bar. In A.O., the Court specifically stated that Guenther remains "good law." Id. at 94. As the Court in A.O. explained, "Guenther created a narrow exception to N.J.R.E. 608 and held that 'in limited circumstances and under very strict controls a defendant has the right to show that a victim-witness has made a prior false criminal accusation for the purpose of challenging that witness's credibility.'" Id. at 93 (emphasis added) (quoting Guenther, 181 N.J. at 154).

Notably, the Court in A.O. reiterated that our courts must be "mindful of its concerns to avoid distracting mini-trials." Ibid. A.O. reflects that Guenther's

A-4141-16T3

delegation of a gate-keeping role to trial judges concerning such proof is permissible and constitutionally acceptable.

5.

For all of these reasons, we reject defendant's various arguments challenging the trial court's exclusion of the proffered "false accusation" evidence from this jury trial. The court's decision to exclude such evidence was soundly based in the record and the governing law, and did not violate his constitutional rights.

B.

We have fully considered the balance of the arguments raised by defendant on appeal, both in his counsel's brief and in his pro se brief. Having done so, we conclude that none of these arguments have sufficient merit to be discussed in this opinion, Rule 2:11-3(e)(2), except that defendant's claims of ineffective assistance of his former trial counsel are reserved for a future petition for post-conviction relief. State v. Preciose, 129 N.J. 451, 460 (1992).

Very briefly, we simply note that the prosecutor's summation clearly did not exceed the bounds of fair comment, given the tenor of defense counsel's own closing argument inviting the jurors to consider the believability of the victims' accounts in this case and the victims' reactions to defendant's alleged assaultive

A-4141-16T3

behavior after it occurred. See State v. Scherzer, 301 N.J. Super. 363, 433-34 (App. Div. 1997) (noting the latitude generally given to prosecutors in closing argument).

Nor did the trial court err in this case in denying defendant's motion for judgment of acquittal, as the State's evidence, including the testimony of the victims, could reasonably support the jurors' findings of guilt. State v. Reyes, 50 N.J. 454, 458-59 (1967); see also R. 3:18-1. There was ample proof that S.P.'s injuries were sufficiently shown to meet the element of "serious bodily injury," or at least an attempt by defendant to inflict such an injury.

We further discern no abuse of discretion or misapplication of the statutory factors that would justify second-guessing the sentence the court imposed. State v. Case, 220 N.J. 49, 65 (2014). The consecutive terms imposed for the respective assaults on the two victims are justified under State v. Yarbough, 100 N.J. 627, 643 (1985).

Finally, we particularly reject defendant's frivolous contention that the trial judge was disqualified because a physician who treated D.B. and S.P. at the hospital emergency room happened to be related to the judge's wife. That physician was not a witness in this case, and no disqualifying conflict of interest was objectively present. DeNike v. Cupo, 196 N.J. 502, 517 (2008) (applying

an objective standard to judicial disqualification issues).  The rest of defendant's pro se arguments are clearly not worthy of comment.  <u>R.</u> 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4141-16T3