**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1138-17T4

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

JUAN F. HERNANDEZ,

      Defendant-Appellant.

_____

        Argued January 22, 2019 – Decided April 26, 2019

        Before Judges Haas, Sumners and Mitterhoff.

        On appeal from Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 15-03-0237.

        Stephen W. Kirsch, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Stephen W. Kirsch, of counsel and on the brief).

        Stephen C. Sayer, Assistant Prosecutor, argued the cause for respondent (Jennifer Webb-McRae, Cumberland County Prosecutor, attorney; Stephen C. Sayer, of counsel and on the brief).

PER CURIAM

Tried by a jury, defendant Juan F. Hernandez was convicted of first-degree conspiracy to commit the murder of Jose Luis Ortiz, N.J.S.A. 2C:11-3(a)(1) and N.J.S.A. 2C:5-2; first-degree promoting organized street crime, N.J.S.A. 2C:33-30(a); first-degree conspiracy to commit the murder of Eduardo Bernal, N.J.S.A. 2C:11-3(a)(1) and N.J.S.A. 2C:5-2; and first-degree conspiracy to commit robbery of Bernal, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:15-1(a)(1). After merger, defendant was sentenced to a twenty-two year prison term, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, for promoting organized street crime, to run consecutive to two consecutive seventeen-year prison terms, subject to NERA, for conspiracy to commit the murders of Ortiz and Bernal, respectively.

Defendant appeals contending:

> POINT I
>
> CONSPIRACY REQUIRES AN AGREEMENT TO PURPOSELY ACCOMPLISH THE CRIMINAL RESULT. HERE, ONE OF THE CHARGED CONSPIRACIES TO MURDER WAS, BY THE STATE'S OWN ADMISSION, UNSUPPORTED BY SUFFICIENT EVIDENCE THAT IT WAS A CONSPIRACY TO PURPOSELY KILL. MOREOVER, NONE OF THE JURY INSTRUCTIONS ON CONSPIRACY TO KILL OR TO ROB PROPERLY CONFINED THE REQUISITE

INTENT TO A PURPOSEFUL ACCOMPLISHMENT OF THE CRIMINAL RESULT. (NOT RAISED BELOW).

A.    THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE CONVICTION FOR CONSPIRACY TO MURDER EDUARDO BERNAL BECAUSE THERE WAS NO EVIDENCE OF AN AGREEMENT TO PURPOSELY KILL HIM.

B.    THE JURY INSTRUCTIONS ON CONSPIRACY TO MURDER IMPROPERLY EXPANDED THE RANGE OF POSSIBLE CONSPIRACIES BEYOND AN AGREEMENT TO PURPOSELY KILL.

C.    THE JURY INSTRUCTIONS ON CONSPIRACY TO ROB EDUARDO BERNAL IMPROPERLY EXPANDED THE RANGE OF POSSIBLE CONSPIRACIES BEYOND AN AGREEMENT TO PURPOSELY ROB THE VICTIM.

POINT II

THE JURY INSTRUCTIONS ON THE CRIME OF "PROMOTION OF ORGANIZED STREET CRIME" IMPROPERLY ALLOWED THE JURY TO REACH A NON-UNANIMOUS VERDICT ON THE CRIMINAL SUBJECT OF THE CONSPIRACY, AND ALSO DEFINED "ORGANIZER" IN AN OVERBROAD MANNER THAT INCLUDED ANYONE INVOLVED IN THE CONSPIRACY; ALTERNATIVELY, MERGER SHOULD BE ORDERED. (NOT RAISED BELOW).

3

POINT III

THE TRIAL PROSECUTOR REPEATEDLY IMPROPERLY BOLSTERED HER CASE AGAINST DEFENDANT BY REFERRING TO SECRET EVIDENCE OUTSIDE THE RECORD THAT DEFENDANT COULD NOT CONFRONT. (NOT RAISED BELOW).

POINT IV

THE SENTENCE IMPOSED IS MANIFESTLY EXCESSIVE; DEFENDANT WAS PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL AT SENTENCING, AND THE JUDGE INCORRECTLY BELIEVED THAT A CONSECUTIVE SENTENCE WAS STATUTORILY REQUIRED FOR [PROMOTING ORGANIZED STREET CRIME].

For the reasons that follow, we affirm.

I.

We begin by briefly summarizing the trial testimony of three co-defendants, Aris Tejada, Ricardo Then Flete, and Antonio Estrella, who all pled guilty and agreed to testify against defendant, and two Bridgeton police officers, Detectives Kenneth Leyman and Vincent Cappoli. Defendant did not testify.

The Murder of Jose Luis Ortiz

On the night of August 16, 2014, Tejada, Flete and Andy Reyes[1] traveled from New Brunswick to Bridgeton to do a "job" for defendant and "go shoot a person regarding . . . [a] brothel." Tejada testified that defendant explained the job to him earlier that day; advising him the target was a "worker" at a Bridgeton brothel. Tejada recruited Flete and Reyes to assist him because the job required more than one person. Flete confirmed that Tejada received all of the instructions from defendant.

According to Tejada, armed with two handguns – .357-mm and 9-mm – provided by defendant, they went to the brothel to shoot the target, Ortiz, but he was not there. Tejada subsequently called defendant, who informed them that Ortiz was at a local pharmacy. The men then picked up Ortiz, who was anticipating their arrival based on arrangements he made with defendant.

After driving for some time, Tejada told Flete to stop the car. Tejada got out of the car and walked over to the passenger's side window, pulled out his gun, and ordered Ortiz to get out. Once Ortiz exited the vehicle, Tejada told him to "get on his knees." Tejada testified he was about to shoot Ortiz when he realized the safety was on, and instead Reyes shot Ortiz in the back of the head

---

[1] Reyes did not testify against defendant.

with the .357 handgun. Tejada claimed he then shot Ortiz several times with the 9-mm handgun after Ortiz was already dead. To the contrary, Flete testified that Tejada shot first.

After shooting Ortiz, the three men failed to follow defendant's instructions to take Ortiz's cell phone, which was allegedly provided by defendant for brothel business, and had defendant's name saved in the contacts as "Guero."

Det. Leyman responded to the crime scene, where Ortiz was pronounced dead, lying in the road on his back, with gunshot wounds to his "head, torso and lower body, and . . . a large quantity of blood around his body." There was a white cell phone and house key next to Ortiz's body, and five 9-mm shell casings nearby.

Although the police found no witnesses to the shooting, they located a home surveillance video that aided their investigation. Although the video's quality was poor, Det. Leyman testified that three individuals were depicted exiting a "dark colored" sedan just before what appeared to be multiple muzzle flashes emanating from a gun. The next day, police went to Ortiz's residence where they seized – with the permission of his roommate – a missed package notice for a Bridgeton address. Based upon a prior investigation, the police

6

knew the location operated as a brothel and went to the address, where they found several slips of paper with Ortiz's name written on them.

<u>The Murder of Eduardo Bernal</u>

Two weeks later, on the night of August 30, defendant picked up Reyes, Flete and Tejada in an Acura TL[2] for another "job" in Bridgeton. Prior to leaving, defendant drove to a nearby parking lot in New Brunswick where homeless individuals waited to be hired for work. Estrella[3] was there looking for work and accepted defendant's work offer, allegedly without knowing what it entailed. They all travelled to a brothel in Bridgeton, different from the one associated with Ortiz.

Upon arriving at the brothel, defendant gave Estrella money and instructed him to go inside, have sex with a prostitute, see how many people were there, and report back to him. According to Tejada, he went with Estrella to the door of the brothel, but only Estrella went inside. Estrella reported that there were two people, a male, later identified as Bernal, and an unidentified female inside. Tejada and Flete testified defendant then instructed them, along with Reyes and

_____

[2] Estrella testified that Reyes was driving a Honda.

[3] In their testimony, Tejada and Flete repeatedly refer to Estrella by his alias "Chuckie."

7

Estrella, "to go in there and deliver a message . . . ," by robbing the location and to "stab [Bernal] up but not kill him."

While Tejada, Flete and Reyes went inside the brothel, Estrella remained outside on the steps. Once inside, Reyes took Bernal into the back room and asked him where the money was. Unable to locate the money, Reyes became irate and started beating Bernal. Believing Bernal "was lying about the money," Reyes stabbed Bernal multiple times with a knife he found in the kitchen. The three men cleaned their clothing and left to meet defendant at a nearby location. Once in the car, Tejada informed defendant "the job was done" and "the person was poked and might die," to which defendant responded, "[t]hat's good. Good job." The four men drove back to New Brunswick.

Receiving a report of a homicide, Det. Leyman went to the brothel. Bernal, "lying on his back beside a mattress sitting on the floor" with "multiple apparent stab wounds to his torso" and "cast-off blood . . . splattered on the wall[,]" was pronounced dead at the scene. During his investigation, Det. Leyman was able to locate surveillance footage from a nearby business, which showed a "gray Acura TL with a[] . . . primer gray or black front fender" circle the block multiple times before two men got out. The video further revealed one man return and then three more men got out of the car; and later four men

8

returned. Det. Leyman testified that he "received information" that revealed defendant was the owner of the Acura TL and local law enforcement agencies assisted in determining that the vehicle was at the brothel on the night of the Bernal murder

The surveillance video footage also enabled Det. Leyman to identify Tejada and link him to the incident through arrest photographs provided by the Middlesex County Police Department. A subsequent search of Tejada's residence discovered a Colt King Cobra .375 magnum revolver and ammunition.[4]

During his interview with Det. Leyman, defendant stated that he did not know Flete or Reyes, and referred to Estrella as a homeless man in New Brunswick, known as "Pike." Defendant indicated: he did not know his own phone number; there were no guns in the car; and he only knew about the brothel through Ortiz, who previously asked about the location. He also stated that he went to Bridgeton, somewhere off US 77, on August 30, to see a man named "Guero," however, Det. Leyman, indicated that this statement contradicted

---

[4] Although the gun and ammunition were never formally linked through testimony, Det. Leyman testified they were found under a false floorboard. The gun, ammunition and pictures of where the gun was located were all placed in evidence for the jury.

surveillance footage, because the Acura passed straight through US 77 and US 40. Lastly, Det. Leyman asked defendant if it would surprise him if "the four people who got out of his Acura had killed someone," and defendant stated "he didn't see it with his own eyes . . . he couldn't say that they had killed him," even though during questioning, Det. Leyman never referred to the victim's gender.

## II.

In defendant's first brief point he argues that improper jury charges were overly broad and led to his conviction for conspiracy – an inchoate offense – to commit the robbery or murder of Bernal that was based on insufficient evidence, because there was no proof of his "purposeful state of mind toward accomplishing the criminal result." State v. Harmon, 104 N.J. 189, 203 (1986). Consequently, he maintains his federal and state due process rights and right to a fair trial were violated, constituting reversible error. We conclude this contention is without merit.

## A.

We begin with an analysis of the offenses of conspiracy and murder. To convict defendant of conspiracy to commit a crime, the State had to satisfy N.J.S.A. 2C:5-2(a), which provides in pertinent part, that

[a] person is guilty of conspiracy with another person or persons to commit a crime if with the purpose of promoting or facilitating its commission he:

(1) Agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) Agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

"[T]he agreement to commit a specific crime is at the heart of a conspiracy charge." State v. Samuels, 189 N.J. 236, 245 (2007). It is well settled that a conspiracy may be proven by circumstantial evidence. State v. Phelps, 96 N.J. 500, 509 (1984). Generally, circumstantial evidence is tested

by the rules of ordinary reasoning such as govern mankind in the ordinary affairs of life. While certain actions of each of the defendants, when separated from the main circumstances and the rest of the case, may appear innocent, that is not significant and undoubtedly appears in every case of criminal conspiracy.

[Samuels, 189 N.J. at 246 (quoting State v. Graziani, 60 N.J. Super. 1, 13-14 (App. Div. 1959)).]

Hence, "[a]n implicit or tacit agreement may be inferred from the facts and circumstances[,]" State v. Kamienski, 254 N.J. Super. 75, 94 (App. Div. 1992),

A-1138-17T4

because co-conspirators generally act in silence and secrecy, State v. Cagno, 211 N.J. 488, 512 (2013).

As for the crime of murder, N.J.S.A. 2C:11-3(a) provides that "criminal homicide constitutes murder when: (1) [t]he actor purposely causes death or serious bodily injury resulting in death; or (2) [t]he actor knowingly causes death or serious bodily injury resulting in death[.]" To convict a defendant of purposeful serious bodily injury murder under N.J.S.A. 2C:11-3(a)(1), the State must prove that it was the defendant's "conscious object . . . to cause serious bodily injury that then resulted in the victim's death" and that the defendant "knew that the injury created a substantial risk of death and that it was highly probable that death would result." State v. Cruz, 163 N.J. 403, 418 (2000).

Guided by these principles, our review of the record indicates the State provided evidence beyond a reasonable doubt that defendant entered into an agreement with co-defendants Tejada, Flete and Reyes with the purpose of promoting or facilitating the purposeful or knowing serious bodily injury of Bernal, which ultimately resulted in Bernal's death. The clear essence of co-defendants' testimony recounted that defendant, as the ringleader, recruited and instructed them to go inside the brothel and stab Bernal. The fact that defendant told them not to kill Bernal, does not exonerate him from Bernal's murder. By

12

directing them to stab Bernal, it was clear that defendant's goal was to inflict serious bodily injury, which could probably, and in fact did, cause his death.

Defendant's culpability is further supported by co-defendants' testimony regarding his response to the "job" they did. When Tejada informed defendant "[the job] was done" and "the person was poked and . . . might die," defendant coldly responded, "[t]hat's good. Good job." Flete likewise testified that defendant "was happy about" Bernal's death.

We agree with the State that defendant's reliance on State v. Abrams, 256 N.J. Super. 390 (App. Div. 1992), to show that his mere expression of satisfaction that Bernal might die is insufficient evidence of his conspiracy to murder him, is misplaced. In Abrams, this court held that a wife's pleasure about her husband's death, her feelings regarding his death and whatever discussions she may have had about the subject, alone were not sufficient evidence of a conspiracy to kill him. 256 N.J. Super at 402. Here, there was more than an expression of satisfaction that Bernal was murdered; there was testimony by co-defendants that defendant directed them to stab Bernal, which could clearly cause serious bodily injury that results in death, and that he was pleased with the result.

A-1138-17T4

B.

Turning to the jury instruction on conspiracy to commit the murder of Bernal, defendant argues that it "fail[ed] to confine the crime to agreements to purposely kill the victim." Likewise, he argues the jury instruction for conspiracy to commit robbery was not "carefully confined to agreements to [purposely] rob [Bernal]." Since defendant raises this argument for the first time on appeal, we review it under the "plain error" standard of appellate review. R. 2:10-2; see State v. Macon, 57 N.J. 325, 336 (1971).

To be sure, we recognize that "[a]ppropriate and proper charges to a jury are essential for a fair trial[,]" State v. Green, 86 N.J. 281, 287 (1981), and that the trial court has an "independent duty . . . to ensure that the jurors receive accurate instructions on the law as it pertains to the facts and issues of each case[.]" State v. Reddish, 181 N.J. 553, 613 (2004). An alleged unchallenged error in the jury charge is analyzed "in light of 'the totality of the entire charge, not in isolation.'" State v. Burns, 192 N.J. 312, 341 (2007) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)). Even so, we are unpersuaded that these unobjected-to flaws in the jury instructions, identified for the first time in defendant's appellate brief, produced an unjust result and warrant a new trial.

14

Instructing the jury on conspiracy to commit the murder of Bernal, the judge advised it to apply the same model jury instruction he had just provided with respect to the charge of conspiracy to commit the murder of Ortiz. Those instructions, in pertinent part from model charges[5] were:

> A person is guilty of [c]onspiracy with another person or persons to commit a crime if with the purpose of promoting or facilitating its commission, he agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime.
>
> . . . .
>
> Our statute provides that a person is guilty of murder if he, one, caused the victim's death or serious bodily injury that then resulted in the victim's death and, two, [Tejada] and [Reyes] did so purposely and knowingly.
>
> . . . .
>
> . . . [S]erious bodily injury means bodily injury that creates a substantial risk of death. A substantial risk of death exists where it is highly probable that the injury will result in death.

---

[5] See Model Jury Charges (Criminal), "Conspiracy (N.J.S.A. 2C:5-2)," (rev. Apr. 12, 2010); Model Jury Charges (Criminal), "Murder (N.J.S.A. 2C:11-3(a)(1) and 3(a)(2))," (rev. June 14, 2004).

The judge further instructed the jury on the model jury charge definitions of "knowingly" and "purposeful."[6]  With respect to the specific charge for conspiracy to commit the murder of Bernal, he told the jury:

> [T]he State must prove the following elements: number one, that the [d]efendant agreed with another person or persons that they or one or more of them would engage in conduct which constitutes a crime or an attempt or solicitation to commit such crime, and two, that the [d]efendant's purpose was to promote or facilitate the commission of the crime of [m]urder.

He then instructed the jury on the model charge for the lesser-included offense of conspiring to commit aggravated assault.[7]

We thus conclude based upon the facts of this case, the judge properly instructed the jury on the charge of conspiracy to commit murder of Bernal.  As noted, the State's proofs strongly established that defendant was guilty of the charge.

---

[6]  See Model Jury Charges (Criminal), "Murder (N.J.S.A. 2C:11-3(a)(1) and 3(a)(2))," (rev. June 14, 2004).

[7]   See Model Jury Charges (Criminal), "Aggravated Assault – Bodily Injury with Deadly Weapon (Purposely or Knowingly) (N.J.S.A. 2C:12-1(b)(2))," (rev. Nov. 3, 2008); Model Jury Charges (Criminal), "Conspiracy (N.J.S.A. 2C:5-2)," (rev. Apr. 12, 2010).

16

C.

As for the charge of conspiracy to commit robbery, defendant contends the jury instructions were not "carefully confined to agreements to purposely rob [Bernal]."  He asserts that although a "purposeful state of mind" was referenced in parts of the instructions, the judge repeatedly referenced "knowingly" rather than "purposely" and, therefore, the conviction must be reversed and remanded for a new trial.  Samuels, 189 N.J. at 245-47.  Applying the plain error standard, as defendant did not object to the instructions when given, we see no unjust result.

Adhering to the model charge, the judge informed the jury that: "[A] person is guilty of [r]obbery if he knowingly inflicts bodily injury or uses force upon another while in the course of committing a theft."[8]  Thus, the requisite mental state is "knowingly," or said differently, the State must prove a defendant had knowledge of the injury or force.  State v. Sewell, 127 N.J. 133 (1992).

The "purposeful" language of conspiracy to commit robbery that defendant's argument hinges on, is only required when establishing that defendant agreed with another for the purpose of promoting or facilitating the

---

[8] Model Jury Charges (Criminal), "Robbery in the First Degree (N.J.S.A. 2C:15-1)," (rev. Sept. 10, 2012).

crime of robbery. N.J.S.A. 2C:15-1(a)(1). Within the robbery charge itself, only the definition of theft includes "purposeful." N.J.S.A. 2C:20-3(a) ("the unlawful taking or exercise of unlawful control over the property of another with the purpose to deprive him thereof."). These definitions, however, were provided to the jury, with the exact language of the model jury charges.

Therefore, the jury was instructed that defendant needed a purposeful state of mind for the conspiracy, and of the elements of robbery. Considering the jury instructions in their entirety, there was no plain error in the instructions given.

III.

In Point II, defendant contends that the jury instructions for promotion of organized street crime were "not specific enough to avoid non-unanimity problems" because the judge included two substantive offenses, first-degree murder and robbery, as the possible conspiratorial goal crimes committed between August 16 through August 30, 2014. Relying on State v. Frisby, 174 N.J. 583, 596 (2002), he argues that because the instruction was overbroad, it allowed the jury to find any of the two murders and the single robbery sufficient to satisfy the conspiratorial goal. He further argues that the judge's definition of "organizer" under N.J.S.A. 2C:33-30 was "absurdly overbroad" to include conspirators and constitutes reversible error. Additionally, relying upon State

18

v. Gonzalez, 444 N.J. Super. 62 (App. Div. 2016), defendant contends that in regard to the "vicarious conspiratorial liability for a substantive offense under N.J.S.A. 2C:2-6," the "and/or" language used by the judge alone constitutes a unanimity error. Again applying the plain error standard, as defendant did not object to the instructions when given, we see no unjust result in the instructions given.

In his jury instruction on promotion of organized street crime, the judge used the "and/or" construction in referring to the crimes:

> You have to decide whether the [d]efendant's purpose was that he or a person with whom he was conspiring would commit the crimes of [m]urder and/or [r]obbery. The State has to prove beyond a reasonable doubt that when he agreed it was his conscious object or purpose to promote or make it easier to commit the crimes of [m]urder and/or [r]obbery.

The judge further instructed the jury that "[t]he State must prove beyond a reasonable doubt that [defendant] conspired to commit any of these crimes. You must unanimously agree about the crimes that [defendant] conspired to commit." (emphasis added). The language in the instruction, however, was not repeated on the verdict sheet, which simply reiterated the statutory language.

Although the judge did not include the unanimity instruction on the verdict sheet, based upon the totality of the instructions given, there was no plain

19

error. The judge carefully and clearly instructed the jury that it must be unanimous about the crime to which defendant conspired and there was no objection to the instruction at trial. We presume the jury followed the instructions given by the judge, see State v. Winder, 200 N.J. 231, 256 (2009), and defendant presents no evidence or argument supporting an abandonment of that presumption.

Moreover, defendant does not argue, and the record does not reveal, any indication of jury confusion concerning the acts for which it found defendant guilty. Thus, there was no unjust result from the instructions concerning promotion of organized street crime based on the lack of a specific unanimity instruction.

As for defendant's argument that the judge's definition of "organizer" was overbroad, we conclude it is without merit. N.J.S.A. 2C:33-30 states, "[a] person promotes organized street crime if he conspires with others as an organizer." The judge properly defined "organizer" as "a person who purposely arranges, devises[,] or plans an organized crime of [c]onspiracy." See State v. Alexander, 136 N.J. 563, 575 (1994) (holding that under N.J.S.A. 2C:35-3 – leader of narcotics trafficking network – an "organizer" is "a person who [purposely] arranges, devises, or plans a drug-trafficking [conspiracy].").

Contrary to defendant's assertion, the judge's definition did not include mere conspirators to the crime. A conspirator is an individual who participates in an agreement, but not one who purposely plans arranges or devises the conspiracy. In fact, the common sense definition of "organizer" is "a person who organizes," and to "organize" means "to <u>arrange</u> by systematic <u>planning</u> and united effort." <u>Organizer</u>, Merriam-Webster's Collegiate Dictionary (11th ed. 2003); <u>Organize</u>, Merriam-Webster (emphasis added). Therefore, the judge's definition and use of organizer was not improper and accordingly not grounds for reversal.

We likewise reject defendant's argument that the promotion of organized street crime and conspiracy offenses for murder and robbery should be merged since they "would pass the same-element test." The merger of offenses requires a double-jeopardy analysis. <u>State v. Quezada</u>, 402 N.J. Super. 277, 287-88 (App. Div. 2008); <u>see</u> <u>State v. Miles</u>, 229 N.J. 83, 86 (2017) ("We now join the majority of jurisdictions in returning to the <u>Blockburger</u>[9] same-elements test as the sole test for determining what constitutes the 'same offense' for purposes of double jeopardy."). This analysis requires two steps, and "[t]he first step

---

[9] <u>Blockburger v. U.S.</u>, 284 U.S. 299 (1932).

requires the court to consider whether the legislature intended to impose multiple punishments." Quezada, 402 N.J. Super. at 288.

The analysis may stop here, because N.J.S.A. 2C:33-30(b) states:

> b. Grading.  Promotion of organized street crime is a crime of one degree higher than the most serious underlying crime referred to in subsection a. of this section, except that where the underlying offense is a crime of the [first-degree], promotion of organized street crime is a [first-degree] crime and the defendant, upon conviction, and notwithstanding the provisions of paragraph (1) of subsection a of [N.J.S.A. 2C:43-6], shall be sentenced to an ordinary term of imprisonment between 15 and 30 years.  A sentence imposed upon conviction of the crime of promotion of organized street crime shall be ordered to be served consecutively to the sentence imposed upon conviction of any underlying offense referred to in subsection a. of this section.
>
> [(Emphasis added).]

It is therefore clear that the legislature intended to allow multiple punishments, because the fact that the crime of promoting organized street crime is separate and higher than a mere conspiracy, and that it expressly calls for consecutive sentences, all signal this intent.

IV.

Defendant, in Point III, citing State v. Branch, 182 N.J. 338 (2005), and State v. Dehart, 430 N.J. Super. 108 (App. Div. 2013), argues the State violated

22

the Confrontation Clause of the Sixth and Fourteenth Amendments of the United States Constitution and analogous New Jersey constitutional provisions when Det. Leyman gave hearsay testimony about information he gathered from his investigation that led him to identify defendant and his co-defendants as suspects. He specifically points to Det. Leyman's testimony that: (1) "he received 'information' . . . [indicating] that defendant was 'known to drive an Acura with a discolored front fender'"; (2) he "was [provided] an address for [defendant] in New Brunswick"; (3) "his investigation led him to agree with the prosecutor's description of [co-defendant] Tejada as a 'known' associate of defendant,"; and (4) "unspecified 'assistance from other departments' allowed him to establish the identities of all the suspects." As with several of defendant's other aforementioned arguments raised for the first time on appeal, since he did not object to Det. Leyman's testimony at trial, we apply the plain error standard of review.

The Sixth Amendment to the Constitution of the United States and Article I, Paragraph 10 of our State Constitution guarantee an accused in a criminal case the right to confront adverse witnesses. State v. Guenther, 181 N.J. 129, 147 (2004). "A defendant's right to confrontation is exercised through cross-examination, which is recognized as the most effective means of testing the

State's evidence and ensuring its reliability." Ibid. (citations omitted). Hence, the intent of the Confrontation Clause is to afford a criminal defendant the opportunity to challenge anyone who presents testimony against him or her. Crawford v. Washington, 541 U.S. 36, 51-59 (2004). This includes "when, at trial, a police officer conveys, directly or by inference, information from a non-testifying declarant to incriminate the defendant in the crime charged." Branch, 182 N.J. at 350 (citing State v. Bankston, 63 N.J. 263, 268-69 (1973)). However, in State v. Luna, 193 N.J. 202, 216-17 (2007), our Supreme Court limited the principle in Bankston, holding that a witness may testify regarding certain investigative steps, but "cannot repeat specific details about a crime relayed to them[,]" by another, unless the testimony would not create an inference that a defendant was implicated in the crime by a non-testifying individual.

We conclude defendant's assertion that Det. Leyman's testimony implicating defendant violates the Confrontation Clause and warrants a reversal of his conviction is without merit, as his reliance on Branch and Dehart is misplaced. In Branch, the jury learned nothing more about the detective's testimony regarding the source of information that had him place defendant's picture in a photo array and was thus left with the impression that the detective had some other knowledge implicating the defendant in the crime. Branch, 182

N.J. at 348. Similarly, in <u>Dehart</u>, this court concluded it was plain error for a police officer to testify that the defendant's photo was included in a photo array because another non-testifying individual told him defendant was a suspect where the critical issue before the jury was identification of the defendant. 430 N.J. Super. at 111-16. In this case, however, the allegedly damaging testimony can be supported by independent sources.

The testimony regarding defendant's vehicle was based on surveillance video footage showing an Acura with a distinctly discolored front fender. Det. Leyman's response to the question of whether he "receive[d] information that indicated an individual known to drive an Acura with a discolored front fender[]" and whether that individual was identified as defendant were "yes." Moreover, the information is corroborated by the co-defendants' testimony. Therefore, the testimony cannot reasonably be said to impress upon the jury the inference that Det. Leyman had some other information of defendant's guilt, nor did it necessarily tie defendant to the crime.

The challenged testimony that Det. Leyman was "provided an address for [defendant] in New Brunswick" does not violate the Confrontation Clause for similar reasons. Simply put, defendant's address for these crimes is irrelevant

considering all of the testimony and evidence provided to the jury implicating his involvement in the alleged crimes.

Lastly, Det. Leyman's testimony that he knew Tejada was a known associate of defendant and that he received help from other law enforcement agencies to help establish the identities of all the suspects, may have violated Confrontation Clause principles because it necessarily requires the jury to infer there was some outside information that would tie defendant, Tejada, and the other suspects together. See Branch, 182 N.J. at 384. Nevertheless, this only amounts to harmless error based upon other independent evidence. Det. Leyman testified that he obtained photographs of Tejada and compared them to the surveillance footage and, based on the similarities, he was able to identify Tejada as one of the men in the video. Additionally, Det. Leyman's testimony that his investigation was assisted by other law enforcement agencies was mitigated by not specifying why the three men were suspects and because the co-defendants testified regarding their involvement in the killings.

V.

In his final brief point, defendant argues that his sentence for first-degree promotion of organized street crime was excessive and his trial counsel was ineffective during the sentencing hearing.

26

We first address the excessive sentence argument. N.J.S.A. 2C:33-30(b), states, in pertinent part, that: "A sentence imposed upon conviction of the crime of promotion of organized street crime shall be ordered to be served consecutively to the sentence imposed upon conviction of any underlying offense referred to in subsection a. of this section." Defendant asserts the statute's plain language mandates a consecutive term for only the underlying offenses listed in the designated subsection that are "purely substantive crimes." Defendant therefore argues that since this case dealt entirely with inchoate conspiracy offenses, the mandatory sentencing provision does not apply and this court should reverse and remand for proper resentencing. We disagree.

The consecutive prison term requirement of N.J.S.A. 2C:33-30(b) clearly includes defendant's convictions. N.J.S.A. 2C:33-30(a) states that "a person promotes organized street crime if he conspires with others as an organizer, supervisor, financier or manager to commit any crime specified in chapters 11 through 18 . . ." of the criminal code. (emphasis added). Accordingly, defendant's convictions for conspiracy to commit the murders of Ortiz and Bernal, N.J.S.A. 2C:11-3(a)(1), and conspiracy to commit robbery of Bernal, N.J.S.A. 2C:15-1(a)(1), require consecutive sentences to the promotion of organized street crime conviction.

As for defendant's claims of ineffective assistance, they are normally reserved for a future petition for post-conviction relief, and not resolved on direct appeal. See State v. Hess, 207 N.J. 123, 145 (2011) (citing State v. Preciose, 129 N.J. 451, 460 (1992)). Only when the ineffective assistance claim can be determined on the trial record alone is it appropriate to dispose of the issue on direct appeal. State v. Castagna, 187 N.J. 293, 313 (2006). Such is the case here.

To establish a claim for ineffective assistance of counsel, a defendant must establish: (1) his attorney's performance was deficient; and (2) defendant was prejudiced as a result of the allegedly deficient performance. Strickland v. Washington, 466 U.S. 668 (1984); State v. Fritz, 105 N.J. 42, 52 (1987). "[B]ald assertions" of ineffective assistance are not enough. State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999). A petitioner "must allege facts sufficient to demonstrate counsel's alleged substandard performance[,]" and the court must view the facts alleged in the light most favorable to the petitioner. Ibid.

At sentencing, the judge gave specific reasons for strongly applying the requisite aggravating factors and indicated that, in his discretion, no mitigating

factors applied.[10] Defendant contends counsel's failure to argue that the sentence was inappropriate and counsel's mere statement that defendant "maintains his innocence" constitutes ineffective assistance. Defendant, however, presents no facts even remotely suggesting that any mitigating factor applied or that an argument should have been made to dissuade the judge from applying any particular aggravating factor. Defendant's only statement during sentencing was that he "is innocent" and the accusations against him were false. Counsel's reiteration that defendant maintained his innocence does not suggest incompetency absent any factual contention that would have resulted in a lesser sentence. As such, trial counsel was not deficient at sentencing.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

---

[10] The judge found the following aggravating factors: defendant has been arrested eight times prior, including three prior indictable offenses, and others, N.J.S.A. 2C:44-1(a)(3); defendant's criminal record and seriousness of the convicted offenses, N.J.S.A. 2C:44-1(a)(6); and the need to deter defendant and others from violating the law, N.J.S.A. 2C:44-1(a)(9).

A-1138-17T4